# SUPREME COURT OF MISSOURI
## en banc


RICHARD D. DAVIS, )
)
        Appellant, )
)
v. ) No. SC94622
)
STATE OF MISSOURI, )
)
        Respondent. )

## APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY
The Honorable Marco A. Roldan, Judge

### Opinion issued April 5, 2016

Richard D. Davis (hereinafter, "Movant") was convicted by a jury of first-degree murder and multiple counts of first-degree assault, forcible rape, and forcible sodomy in connection with the deaths of Marsha Spicer (hereinafter, "Spicer") and Michelle Huff Ricci (hereinafter, "Ricci"). The circuit court adopted the jury's recommendation and sentenced Movant to death for Spicer's murder and sentenced Movant to thirteen life sentences as a persistent sex offender, nine life sentences as a persistent offender, and two additional fifteen-year sentences as a persistent offender on the remaining counts. This Court affirmed Movant's convictions. *State v. Davis*, 318 S.W.3d 618 (Mo. banc 2010). Movant filed a motion for post-conviction relief pursuant to Rule 29.15, which the motion court overruled after an evidentiary hearing. Movant appeals. This Court has exclusive jurisdiction over this appeal because a death sentence was imposed. Mo.

Const. art. V, sec. 10. *See also* Standing Order, June 16, 1988 (effective July 1, 1988). This Court affirms the motion court's judgment.

## Factual and Procedural History

In May 2006, police discovered Spicer's body in a shallow grave in Lafayette County. Movant was identified as a suspect in that investigation. Search warrants executed on Movant's apartment and workplace recovered numerous items, including a video camera and several videotapes. The videotapes depicted Movant and his girlfriend repeatedly physically and sexually assaulting Spicer and Ricci. One videotape recorded the moment of Spicer's death while being sexually assaulted by Movant's girlfriend. Movant confessed to killing Spicer during the sexual assault, cleaning her body with bleach, and dumping her body in the shallow grave.

The state filed a twenty-six count amended information charging Movant with first-degree murder for Spicer's death and multiple counts of first-degree assault, forcible rape, and forcible sodomy of Spicer and Ricci. Movant did not testify or present witnesses during the guilt phase of his trial. Instead, Movant's counsel cross-examined the state's witnesses to show that Movant got "caught up" in the moment and did not deliberate during Spicer's murder. The jury convicted Movant of all counts except one count of first-degree assault against Ricci.[1]

The state submitted three statutory aggravators: (1) that Movant had one or more serious assaultive convictions; (2) that Spicer's murder involved depravity of mind; and

---

[1] In August 2012, Movant pleaded guilty to first-degree murder for Ricci's death in a separate proceeding.

(3) that Spicer's murder occurred while Movant was engaged in the perpetration of rape. The state presented evidence that Movant and his girlfriend took Ricci to a remote area, murdered her, and set her body on fire in an attempt to destroy evidence. Additional evidence showed that, while evading arrest, Movant and his girlfriend kidnapped, sexually assaulted, sodomized, and beat a five-year-old child. The state presented further evidence of other crimes, including that Movant previously raped and sodomized a woman at knifepoint.

During the penalty phase, Movant presented mitigation testimony from a psychologist, Dr. Steven Mandracchia (hereinafter, "Dr. Mandracchia"). Dr. Mandracchia evaluated Movant's mental condition, at the time of the crimes and at trial, and assessed whether developmental issues contributed to his conduct. Dr. Mandracchia testified that physical and sexual abuse, including beatings by his stepfather, lack of interpersonal connections in Movant's family, as well as his exposure to inconstant adult figures, prevented normal development. Dr. Mandracchia testified that by the age of six, family members were setting up real or simulated sexual acts for Movant and his sister to engage in, and by age ten, Movant was engaging in sexual activity with a number of people. By age fifteen, regular sexual activity had become "routine," and Movant became involved in anal sex, rough sex, and group sex. An aunt made him engage in sexual activity with his sister. There was evidence indicating that Movant was molested by his stepfather. Medical records revealed that Movant was depressed, was anxious, had low self-esteem, and that his anger and his sexuality became associated. Dr. Mandracchia concluded that Movant had several severe personality

3

disorders, including antisocial personality disorder, narcissism, and paranoid personality disorder.

Movant testified during the penalty phase. Movant expressed sorrow for what he had done to his victims and explained the history of abuse in his family. Movant also called a former girlfriend, another friend, and his sister to testify on his behalf.

After hearing all of the evidence, the jury found all three statutory aggravators were met and recommended Movant be sentenced to death for Spicer's murder. The circuit court sentenced Movant in accordance with the jury's recommendation. This Court affirmed Movant's conviction and sentence. *Davis*, 318 S.W.3d at 618.

Movant then filed a *pro se* motion to vacate his first-degree murder conviction and sentence pursuant to Rule 29.15. Appointed counsel filed an amended motion. Movant submitted a 218-page document as an attachment to the amended motion, raising a number of additional ineffective assistance of counsel claims. Attached to the 218-page document was a separate thirty-seven page document raising arguments related to the suppression issues presented at trial. After a six-day evidentiary hearing, the motion court entered a 135-page judgment overruling Movant's motion. Movant appeals.

**Standard of Review**

This Court reviews the denial of post-conviction relief to determine whether the motion court's findings of fact and conclusions of law are clearly erroneous. Rule 29.15(k). "A judgment is clearly erroneous when, in light of the entire record, the court is left with the definite and firm impression that a mistake has been made." *Swallow v. State*, 398 S.W.3d 1, 3 (Mo. banc 2013). The motion court's findings are presumed

4

correct. *Johnson v. State*, 406 S.W.3d 892, 898 (Mo. banc 2013). This Court defers to "the motion court's superior opportunity to judge the credibility of witnesses." *Barton v. State*, 432 S.W.3d 741, 760 (Mo. banc 2014) (quoting *State v. Twenter*, 818 S.W.2d 628, 635 (Mo. banc 1991)).[2]

To be entitled to post-conviction relief for ineffective assistance of counsel, a movant must show by a preponderance of the evidence that his or her trial counsel failed to meet the *Strickland* test in order to prove his or her claims. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Under *Strickland*, Movant must demonstrate that: (1) his trial counsel failed to exercise the level of skill and diligence that a reasonably competent trial counsel would in a similar situation, and (2) he was prejudiced by that failure. *Id*. at 687, 104 S. Ct. 2052.

Movant must overcome the strong presumption that trial counsel's conduct was reasonable and effective. *Johnson*, 406 S.W.3d at 899. To overcome this presumption, a movant must identify "specific acts or omissions of counsel that, in light of all the circumstances, fell outside the wide range of professional competent assistance." *Zink*, 278 S.W.3d at 176. Trial strategy decisions may be a basis for finding ineffective

---

[2] Movant alleges the motion court's credibility findings do not defeat a claim of prejudice in that the motion court's determination cannot substitute for a jury's appraisal at the time of trial, citing *Kyles v. Whitley*, 514 U.S. 419, 449, n.19, 115 S. Ct. 1555, 1573, 131 L.Ed.2d 490 (1995). "Simply because the motion court found individuals to be credible on certain issues and not credible on others does not indicate any error by the motion court." *Zink v. State*, 278 S.W.3d 170, 192 (Mo. banc 2009). The motion court's rejection of certain witness testimony as non-credible goes to whether Movant met his burden of demonstrating a claim for relief, not whether the jury would have believed that witness at trial.

5

assistance of counsel only if that decision was unreasonable. *Id.* "[S]trategic choices made after a thorough investigation of the law and the facts relevant to plausible opinions are virtually unchallengeable[.]" *Anderson v. State*, 196 S.W.3d 28, 33 (Mo. banc 2006) (quoting Strickland, 466 U.S. at 690, 104 S. Ct. at 2052).

"To establish relief under *Strickland*, a movant must prove prejudice." *Johnson*, 406 S.W.3d at 899. Prejudice occurs when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Deck v. State*, 68 S.W.3d 418, 429 (Mo. banc 2002) (citing *Strickland*, 466 U.S. at 694, 104 S. Ct. 2052). Prejudice in a death penalty case is "a reasonable probability that, but for counsel's deficient performance, the jury would have concluded the balance of aggravating and mitigating circumstances did not warrant death." *Forrest v. State*, 290 S.W.3d 704, 708 (Mo. banc 2009) (quoting *State v. Kenley*, 952 S.W.2d 250, 266 (Mo. banc 1997)).

### Point I – Retention of a Male Trauma Expert

In his first point, Movant alleges the motion court clearly erred in denying his claim that trial counsel were ineffective for failing to call an appropriate expert to present Movant's complete psychosocial, psychosexual, and trauma history in the penalty phase of the trial as mitigating evidence. Movant argues Dr. Mandracchia had no expertise in assessing or evaluating males with trauma stemming from sexual abuse. Movant claims that if the jury had heard testimony from an expert that specialized in evaluating males who suffered sexual abuse, there is a reasonable probability he would have received a life

sentence because the jury would have been provided with a reason for Movant's behavior.

In a death penalty case, trial counsel has an obligation to investigate and discover all reasonably available mitigating evidence. *Johnson v. State*, 388 S.W.3d 159, 165 (Mo. banc 2012). Trial counsel's selection of which expert witnesses to call at trial is generally a question of trial strategy and is virtually unchallengeable. *Goodwin v. State*, 191 S.W.3d 20, 29 (Mo. banc 2006). To show ineffective assistance of counsel based on failure to present an expert witness, a movant is required to show what the evidence would have been if called. *Twenter*, 818 S.W.2d at 636. However, the "duty to investigate does not force defense lawyers to scour the globe on the off-chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Strong v. State*, 263 S.W.3d 636, 652 (Mo. banc 2008) (quoting *Rompilla v. Beard*, 545 U.S. 374, 383, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005)).

To support his claim, Movant presented the testimony of Dr. Victoria Reynolds (hereinafter, "Dr. Reynolds"), a clinical psychologist who specializes in trauma. Dr. Reynolds interviewed Movant three times over approximately thirteen hours, reviewed a portion of Movant's records, penalty phase trial testimony excerpts, and interviewed Movant's sister and a childhood friend. Dr. Reynolds' evaluation focused on Movant's childhood and adolescent psychosexual history. Dr. Reynolds discussed Movant's family history, childhood, his relationship with his mother and stepfather, and several instances of sexual abuse that occurred during Movant's childhood and

7

adolescence. Dr. Reynolds ultimately concluded Movant was "disregulated," meaning "he alternates between pulse, extremes of relatedness, over-relatedness, overattachment, obsessionality … or feelings of guilt and protection …." Dr. Reynolds explained Movant can also "be completely cut off to the point that he does not understand the feelings" of other people or that people are in pain. Dr. Reynolds did not offer a diagnosis, and her opinions were not meant to evaluate any activity or actions related to the underlying crimes.

Dr. Reynolds did not review certain records, Movant's trial testimony, or view the videotapes depicting the crimes or Movant's police interrogations. Dr. Reynolds did not ask Movant about the crimes themselves. Dr. Reynolds stated it was a "given" going into Movant's evaluation that he suffered from trauma because it was her understanding that she would only be contacted if there is "a very strong reason to suspect there is [trauma]." Dr. Reynolds described Movant as "fully cooperative." Movant did not refuse to speak about any subject but, instead, went into explicit detail about several prior instances of abuse. Dr. Reynolds admitted she had post-trial access to substantially more information concerning Movant's alleged history of sexual abuse than did Dr. Mandracchia.

Dr. Reynolds recognized issues with Movant's credibility, testifying that "[i]t's possible that at times some of the information [Movant] was giving [her] was not accurate for whatever reason," and that if Movant lied to her about his prior history, the foundation for her opinion "collapses." Dr. Reynolds also admitted that Movant told her, "I reinvent myself everyplace I live" and that Movant "probably told me things that aren't true. Does that mean I am going to have difficulty sorting out the veracity of some?

8

Yes." Dr. Reynolds further conceded she was unable to corroborate Movant's allegations of sexual abuse. Dr. Reynolds attempted to rationalize Movant's many contradictions as indicia or "footprints" of the trauma he suffered, rather than consider it was self-serving testimony in a post-conviction proceeding.

The motion court categorically rejected Dr. Reynolds' testimony, finding she was not a credible witness. The motion court noted that most of the critical sources upon which Dr. Reynolds based her opinions and conclusions were either unreliable, non-credible, or both. The motion court specifically referenced Dr. Reynolds' reliance upon Movant's self-reported, post-conviction disclosures of sexual abuse that were not made to the defense team prior to trial. The motion court explicitly found Movant was "*not* a valid, reliable, or credible source of information of any kind or to any degree." This Court defers to the motion court's credibility determinations and finds the motion court did not clearly err in reaching this conclusion.

Movant alleges trial counsel were ineffective for failing to provide the jury with a reason for his behavior. Movant concedes that Dr. Mandracchia's testimony during the penalty phase touched upon several subjects presented by Dr. Reynolds, but argues Dr. Mandracchia's testimony did not provide a complete picture of the multiple forms of sexual, physical, and emotional trauma Movant suffered due to multigenerational incest, sexual and physical abuse, drug use, and prostitution to which he was subjected during childhood. The motion court specifically rejected this argument, finding Dr. Reynolds' testimony provided a different "gloss" or "spin" to the testimony presented at trial. The

9

motion court also found Dr. Mandracchia was "more than qualified to diagnose Movant and offer his opinions at trial."

While trial counsel has a duty to present relevant mitigating evidence, trial counsel is not obligated to shop for an expert witness who might provide the most or more favorable testimony. *McLaughlin v. State*, 378 S.W.3d 328, 343 (Mo. banc 2012). Further, trial counsel's failure to develop or present evidence that is cumulative to that presented at trial does not constitute ineffective assistance of counsel. *Forrest*, 290 S.W.3d at 709.

Dr. Mandracchia took into account Movant's childhood sexual abuse, and stated that drug use, physical abuse, abandonment, and lack of positive role models all played a part in Movant's development. While Dr. Mandracchia did not use the word "trauma" to describe what Movant endured during his childhood and adolescence, this concept was conveyed to the jury during Dr. Mandracchia's penalty phase testimony. Trial counsel were not ineffective for failing to shop for a more favorable expert who would present cumulative evidence.

Finally, Movant's full communication and cooperation with Dr. Reynolds during their post-conviction interactions was in stark contrast to Movant's behavior pretrial, where he persistently refused to cooperate with trial counsel and the mental health experts retained to evaluate him.[3] The record is replete with references to Movant's recalcitrance and unwillingness to cooperate prior to and during the trial.

---

[3] Movant argues that his lack of cooperation was related directly to his mental illness, which was supported amply by evidentiary hearing testimony. As will be discussed

10

Tom Jacquinot (hereinafter, "Jacquinot") was lead trial counsel during Movant's case. Jacquinot described the communication issues the defense team had with Movant in detail. Jacquinot testified about Movant's reluctance to work with the experts who were retained and Movant's unwillingness to discuss any prior instances of sexual abuse. Jacquinot testified that he considered hiring an expert in sexual and physical trauma for Movant but ultimately decided against it due to Movant's lack of cooperation. The motion court found Jacquinot's explanation credible and that it constituted a reasonable trial strategy.

Susan Elliott (hereinafter, "Elliott") also represented Movant at trial. Elliott testified at the evidentiary hearing that Movant would not listen to counsel's advice and wanted to control the course of any trial discussion. Elliott described Movant as a difficult client who did not want to talk about himself. Elliott stated that Movant did not work with the defense team, he was mistrustful, he was not forthcoming with information, and he attempted to have them fired several times during their representation.

Movant's defense team also included Carol Muller (hereinafter, "Muller"), a mitigation specialist. Muller testified that it was difficult to obtain Movant's confidence and that he was very mistrustful of everyone on his defense team after having a challenging experience with previous defense counsel. Muller described Movant as "very closed up" and reluctant to talk about any specifics regarding his sexual abuse.

_infra_, the motion court found this testimony non-credible and went so far as to question whether Movant even suffered from bipolar I disorder based on the evidence presented.

11

Muller also testified that Movant was not a good historian and did not disclose much information to the team.

Dr. Mandracchia testified via pretrial deposition about his difficulty in obtaining information from Movant. Dr. Mandracchia described Movant as vague, extremely reluctant, and resistant to discussing any possibility that sexual abuse occurred. At one point Movant outright refused to disclose whether his stepfather abused him.

Dr. William Logan (hereinafter, "Dr. Logan") also worked with Movant prior to trial. Dr. Logan described his relationship with Movant at one point as "fragile" and that he avoided "agitating" Movant during their sessions. Dr. Logan's contact ceased well before trial when communications broke down, and Dr. Logan decided further meetings would not be helpful. Accordingly, Dr. Logan was not called as a witness on Movant's behalf. Jacquinot believed Dr. Logan was not the best advocate for Movant because their relationship deteriorated and Dr. Logan seemed frustrated, angry, and manipulated by Movant.

This Court will not find trial counsel ineffective for employing strategic decisions regarding expert witnesses where the record reflects the defendant failed to cooperate with the defense team regarding evaluation by those witnesses. *See Strong*, 263 S.W.3d at 649-50; *State v. Brown*, 998 S.W.2d 531, 550 (Mo. banc 1999); and *State v. Simmons*, 955 S.W.2d 729, 747 (Mo. banc 1997). Moreover, trial counsel is not ineffective for pursuing one reasonable trial strategy to the exclusion of another. *Barton*, 432 S.W.3d at 749. The motion court did not clearly err in overruling Movant's claim on this issue.

12

**Failure to Call a Witness to Testify**

Movant raises several points alleging trial counsel were ineffective for failing to call Dr. Logan to testify at the guilt and penalty phases of his trial regarding Movant's mental health issues. "Ordinarily the choice of witnesses is a matter of trial strategy and will support no claim of ineffective assistance of counsel." *Barton*, 432 S.W.3d at 750-51 (quoting *State v. Harris*, 870 S.W.2d 798, 816 (Mo. banc 1994)). "This is because 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Id*. at 751. "To prove ineffective assistance for failure to call a witness, the defendant must show that: '(1) trial counsel knew or should have known of the existence of the witness; (2) the witness could be located through reasonable investigation; (3) the witness would testify; and (4) the witness's testimony would have produced a viable defense.'" *Glass v. State*, 227 S.W.3d 463, 468 (Mo. banc 2007) (quoting *Hutchison v. State*, 150 S.W.3d 292, 304 (Mo. banc 2004)).[4] This standard of review will guide the analysis of Movant's next five points on appeal.

**Point II – Competence to Stand Trial**

Movant argues the motion court clearly erred in denying his claim that trial counsel were ineffective for failing to present testimony from Dr. Logan to challenge Movant's competency to stand trial. Movant alleged he was not competent to be tried, as evidenced by a letter dated August 24, 2007 (hereinafter, "the August 2007 letter"). This letter, drafted by Movant, purportedly documented his behavioral changes after ingesting

---

[4] *Hutchison* was overruled on other grounds by *Mallow v. State*, 439 S.W.3d 764, 770 n.3 (Mo. banc 2014).

13

a prescribed psychotropic medication and identified potential witnesses who observed these personality changes. Dr. Logan reviewed the August 2007 letter and other evidence in connection with Movant's post-conviction relief claims. Dr. Logan opined that Movant had bipolar I disorder and suffered from this disorder prior to the time the crimes occurred. Dr. Logan concluded that Movant was incapable of assisting his defense and was incompetent to be tried for Spicer's murder. Movant's Rule 29.15 motion concedes that he had the capacity to understand the proceedings against him but claims that his ability to "collaborate and adequately provide information that would have facilitated a more comprehensive mental disease" was impaired.

Section 552.020.1, RSMo 2000,[5] provides, "No person who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted or sentenced for the commission of an offense so long as the incapacity endures." A defendant is competent when he or she "has sufficient ability to consult with his [or her] lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him [or her]." *State v. Baumruk*, 85 S.W.3d 644, 648 (Mo. banc 2002) (quoting *State v. Johns*, 34 S.W.3d 93, 104 (Mo. banc 2000)). Movant is presumed to be fit to proceed and bears the burden of proof to demonstrate otherwise. Section 552.020.8.[6]

---

[5] All statutory references are to RSMo 2000 as supplemented.

[6] Movant criticizes the state for failing to counter Dr. Logan's opinion as to Movant's competence with any evidence of its own. However, section 552.020.8 makes clear that Movant bears the burden of proving he is incompetent to proceed, and the state's actions in attacking the underlying sources that served as the basis Dr. Logan's opinion was proper.

In March 2006, Movant was treated by a psychiatrist, Dr. Wade Hachinksy (hereinafter, "Dr. Hachinsky"), for anxiety and depression. Dr. Hachinsky diagnosed Movant with generalized anxiety disorder, depressive disorder not otherwise specified, and did not rule out the possibility that Movant suffered from bipolar I disorder. Dr. Hachinsky prescribed Lexapro, an antidepressant known as a selective serotonin reuptake inhibitor ("SSRI"), and Ativan. Dr. Hachinsky did not prescribe a mood stabilizer. This treatment occurred approximately two weeks before Ricci's murder and less than two months before Spicer's murder. At a follow up appointment, Dr. Hachinsky changed Movant's medication from Lexapro to Paxil, another SSRI medication. When Dr. Hachinsky saw Movant ten days after Ricci's murder and a few days after Spicer's murder, Dr. Hachinsky described Movant as stable and indicated the medications were working.

Jacquinot testified that the defense team never fully discounted the fact that Movant had mood disorders or possible bipolar disorder. Jacquinot asked Dr. Logan to evaluate Movant for competence to stand trial. Dr. Logan discussed his findings at a pretrial deposition. Dr. Logan recommended medication that he believed would aid Movant's mood, but he did not diagnose Movant with any mental diseases or disorders that would indicate Movant was incompetent to stand trial. Dr. Logan stated he read Dr. Hachinsky's records closely when making this evaluation and was aware Dr. Hachinsky did not rule out the possibility that Movant suffered from bipolar I disorder. Dr. Logan ultimately concluded that, despite ongoing discussions about Movant's competence, he could never determine beyond a reasonable degree of medical certainty

15

that Movant was not competent to stand trial. Dr. Logan also stated pretrial that Movant's "behavior was too organized for a manic episode." When asked if Movant was competent to stand trial, Dr. Logan replied, "It's a close one, but I'd say yes." Dr. Mandracchia also evaluated Movant and found him competent to stand trial.

Dr. Logan's opinions changed after he evaluated Movant in connection with the post-conviction relief proceedings. Dr. Logan reviewed various materials, including the August 2007 letter, which contained pages of purported changes to Movant's behavior after ingesting the SSRI medication, and institutional mental health records that indicated Movant was afflicted with bipolar I disorder. Dr. Logan also interviewed Movant. At the evidentiary hearing, Dr. Logan opined that Movant suffered from bipolar I disorder, which qualified as a severe mental disease or defect rendering him incompetent to stand trial for Spicer's murder.

Jacquinot testified neither expert retained pretrial stated they saw a significant severity or a continuous manic episode throughout the time period leading up to and through the crimes that would constitute a full or partial chapter 552 defense. Jacquinot had no recollection of receiving the August 2007 letter or giving it to Dr. Logan. Elliott did not recall the August 2007 letter specifically, but she recalled some of the things that were mentioned in the letter and attempted to corroborate the information contained therein, but to no avail.

The motion court ultimately concluded Dr. Logan was a non-credible witness for a number of reasons. The motion court found Dr. Logan's testimony "very suspect" because it relied upon Movant's self-reported thoughts and behaviors years after the fact

16

and after being convicted. The motion court specifically found Movant to be a non-credible witness on any matter and Dr. Logan's reliance upon any information obtained from Movant to formulate his opinions significantly damaged Dr. Logan's credibility. The motion court found fault with Dr. Logan's actions in "consistently and knowingly avoid[ing] or fail[ing] to seek out information during the post-conviction phase of the case that may have disproven, disconfirmed, or altered his diagnosis." In summation, the motion court explicitly discounted Dr. Logan's opinion that Movant suffered from bipolar I disorder, finding the evidence Dr. Logan relied upon to reach this diagnosis was suspect and did not "provide a reliable basis for the determination that Movant currently is, or has been, afflicted with bipolar disorder at any time in the past."

With respect to the August 2007 letter, the motion court found, and the record reflects, that in the absence of the letter, Dr. Logan did not testify that if he had the letter prior to trial, its contents would have changed or altered his pretrial diagnosis. Given that Dr. Logan testified that Movant's thoughts were too disorganized and hard to follow prior to trial, discussing the contents of the August 2007 letter, which were largely cumulative of other information Dr. Logan had available to him, would not have produced additional, viable information.

Finally, Movant again argues that all of his uncooperativeness was evidence of his incompetence. The motion court rejected this finding. "When communication problems are caused by the defendant's desire to control the defense, as opposed to mental impairments, and there is no indication that the defendant is generally incapable of cooperating with counsel, the defendant does not demonstrate that he is incompetent to

17

stand trial." *Zink*, 278 S.W.3d at 185 n.8. Based on the foregoing, Movant failed to demonstrate that he would have been found incompetent to stand trial. The motion court did not err in overruling Movant's claim.

## Point III – Diminished Capacity due to Bipolar I Disorder

Movant alleges the motion court clearly erred in denying his claim that trial counsel were ineffective for failing to call Dr. Logan during the guilt phase to support a diminished capacity defense based upon Dr. Logan's diagnosis that Movant suffered from bipolar I disorder. Movant claims that had trial counsel provided Dr. Logan with all available information, including the August 2007 letter, and presented this evidence to the jury, there is a reasonable probability that Movant would not have been convicted of first-degree murder.

Section 552.015.2(8) permits a defendant to present evidence that he or she suffers from a mental disease or defect "[t]o prove that the defendant did or did not have a state of mind which is an element of the offense." This is commonly referred to as the diminished capacity defense. *State v. Walkup*, 220 S.W.3d 748, 754 (Mo. banc 2007). "Evidence of diminished capacity is intended simply to negate an element of the state's case -- a culpable mental state -- which is the state's burden to prove beyond a reasonable doubt." *Id*. at 755.

Trial counsels' failure to present a diminished capacity defense was a matter of reasonable trial strategy. Jacquinot testified that he based this decision on the pretrial assessments of Drs. Mandracchia and Logan, both of whom found there was no evidence of diminished capacity presented. Movant argues that trial counsel were ineffective for

18

failing to provide the August 2007 letter to the doctors so that they could make an informed diagnosis. As discussed previously, Dr. Logan had access to Dr. Hachinsky's records and information from Movant detailing his purported changes in behavior around the time of the crimes. Any failure by trial counsel to supply this letter was not prejudicial because it was cumulative to the evidence Dr. Logan had available to him to formulate an opinion about any potential diminished capacity defense. Trial counsel will not be found ineffective for failing to present cumulative evidence. *Dorsey v. State*, 448 S.W.3d 276, 295 (Mo. banc 2014). Finally, Jacquinot testified that given the overwhelming weight of the evidence, including the fact that Spicer's murder was captured on videotape, he did not think the jury would believe a diminished capacity defense. Trial counsel will not be found ineffective for choosing to pursue one reasonable trial strategy to the exclusion of another. *Barton*, 432 S.W.3d at 749. The motion court did not clearly err in overruling Movant's claim on this issue.

## Point IV – Mitigation Evidence of Bipolar I Disorder

Movant argues the motion court clearly erred in denying his claim that trial counsel were ineffective for failing to call Dr. Logan during the penalty phase to present evidence of Movant's bipolar I disorder diagnosis. Movant claims that had trial counsel presented the August 2007 letter to support Dr. Logan's diagnosis and the other foundations for his opinion, there is a reasonable probability that Movant would not have been sentenced to death.

"Virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." *Hutchison*, 150 S.W.3d at

19

304 (quoting *Tennard v. Dretke*, 542 U.S. 274, 124 S. Ct. 2562, 2570, 159 L. Ed. 2d 384 (2004)). Prevailing professional standards for capital defense work require trial counsel to "discover *all reasonably available* mitigating evidence ...." *Wiggins v. Smith*, 539 U.S. 510, 524, 123 S. Ct. 2527, 2537, 156 L. Ed. 2d 471 (2003). This evidence includes "medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." *Id.* at 524, 123 S. Ct. at 2537. Section 565.032.3 outlines mitigating circumstances, including extreme mental or emotional disturbance, extreme distress or domination by another, and substantial impairment of capacity to appreciate the criminality of his or her conduct or to conform it to the requirements of law.

Movant faults trial counsel for failing to present evidence of his bipolar I disorder diagnosis to the jury during the penalty phase as relevant mitigating evidence. This claim relies largely on the same arguments and evidence presented in Movant's diminished capacity claim. The motion court explicitly rejected Dr. Logan's opinion that Movant suffered from bipolar I disorder because Dr. Logan's resources, methodology, and reliance on Movant as a credible reporter of his symptoms were suspect and non-credible.

The record further reflects that trial counsel attempted to gather as much mitigating evidence as they could because they believed Movant's case was better tried in the penalty phase due to the overwhelming weight of evidence demonstrating Movant's guilt. The defense team specifically investigated whether Movant suffered from any mental illness that would serve as a statutory mitigating factor. Both Drs. Logan and Mandracchia informed the defense team prior to trial that he did not. In light of the

20

appalling and gruesomely documented evidence presented as aggravating circumstances to support the death penalty in this case, there was no reasonable probability that Dr. Logan's proposed testimony would have resulted in Movant receiving a different sentence. The motion court did not clearly err in ruling on this issue.

### Point V – Not Guilty by Reason of Insanity due to Bipolar I Disorder

Movant contends the motion court clearly erred in denying Movant's claim that trial counsel were ineffective for failing to call Dr. Logan during the guilt phase to support a not guilty by reason of insanity ("NGRI") defense, relying on Movant's bipolar I disorder diagnosis. Movant argues that had trial counsel presented this evidence, there is a reasonable probability Movant would have been found not guilty by reason of mental disease or defect.

Section 552.030.1 provides, "A person is not responsible for criminal conduct if, at the time of such conduct, as a result of mental disease or defect such person was incapable of knowing and appreciating the nature, quality, or wrongfulness of such person's conduct." NGRI "is considered an affirmative defense, requiring the defendant to carry the burden of proving that he has a mental disease or defect excluding responsibility" at the time of the conduct charged. *Walkup*, 220 S.W.3d at 755.

Dr. Logan testified at the evidentiary hearing that he did not have sufficient information upon which to determine whether an NGRI defense was viable prior to trial. However, after examining additional information, including the August 2007 letter, Dr. Logan opined at the evidentiary hearing that Movant suffered from bipolar I disorder and lacked responsibility for his crimes.

Jacquinot testified that the defense team never fully discounted the fact that Movant had mood disorders or possible bipolar disorder. However, Drs. Logan and Mandracchia both testified that when they examined Movant prior to trial, there was no evidence Movant suffered from any mental disease or defect that would relieve him of responsibility for Spicer's murder. When Elliott and Muller consulted with Dr. Logan prior to trial about any potential insanity defense, Dr. Logan told them that he believed his role would be better served in mitigation, thus, creating a reasonable inference that an insanity defense was not viable. Jacquinot also testified that if a retained expert opined Movant could utilize the NGRI defense, he would be less inclined to present that expert's testimony at trial. Jacquinot explained that the expert's opinion would be "far enough off the mark given the totality of the evidence in [Movant's] case, that you would lose credibility with the jury if you went for a full-blown insanity defense." Jacquinot felt that any expert "that was going to endorse NGRI in this case would be grossly overreaching."

"When defense counsel believes a witness' testimony would not unequivocally support his client's position, it is a matter of trial strategy not to call him, and the failure to call such witness does not constitute ineffective assistance of counsel." *Winfield v. State*, 93 S.W.3d 732, 739 (Mo. banc 2002). The decision to forego the NGRI defense was reasonable trial strategy given the lack of evidence to support the claim and Jacquinot's belief that an expert asserting such a claim would not be a credible witness.

This Court must defer to the motion court's findings that Dr. Logan was not a credible witness and that his pretrial deposition testimony wholly contradicted his post-conviction testimony. The motion court explicitly found:

22

Dr. Logan's knowing failure to view the actual crime videotapes while opining that Movant was not responsible for the very act Dr. Logan chose not to watch -- choosing instead to take Movant's post-conviction word for his state of mind during that event -- had a devastating impact on Dr. Logan's credibility. This failure was so fundamental that it failed to provide any credibility to Dr. Logan's opinions.

The motion court did not clearly err in failing to grant Movant post-conviction relief on this issue.

### Point VI – Involuntary Intoxication due to SSRI Medication

Movant argues the motion court clearly erred in denying his claim that trial counsel were ineffective for failing to call Dr. Logan during the guilt phase to support either an involuntary intoxication or diminished mental capacity defense based upon the fact that Movant was prescribed SSRI medication without a mood stabilizer. Movant claims this medication caused him to not know or appreciate the nature, quality, or wrongfulness of his conduct and there is a reasonable probability that Movant would not have been convicted of first-degree murder. Alternatively, Movant contends this evidence should have been presented during the penalty phase in mitigation, wherein Movant would not have been sentenced to death. Movant raised this claim in his *pro se* attachment to the amended Rule 29.15 motion and included approximately thirty-five pages of alleged symptoms, witness names, and citations to various studies and articles, which he claims support his allegation that his behavior changes leading up to the crimes were caused by the SSRI medication.

Section 562.076.1 provides, "A person who is in an intoxicated or drugged condition, whether from alcohol, drugs or other substance, is criminally responsible for

23

conduct unless such condition is involuntarily produced and deprived him [or her] of the capacity to know or appreciate the nature, quality or wrongfulness of his conduct." The defendant bears the burden of injecting the issue of an involuntary intoxicated or drugged condition at trial. Section 562.076.2.

Movant filed several *pro se* pretrial motions complaining that trial counsel were failing to pursue a defense that Movant's behavior changed dramatically after he started taking prescribed SSRI medication. During his pretrial deposition, Dr. Logan noted Dr. Hachinksy prescribed Ativan and Lexapro, which Movant claimed did not work very well. Dr. Logan suspected if the medication did not work well, Movant did not take them for long. After Movant's medication was adjusted, Dr. Logan found the medications were "pretty standard clinical dosages" that would not have caused any "marked change" in Movant's behavior.

Elliott testified at the evidentiary hearing that she was responsible for investigating any defense surrounding Movant's ingestion of SSRI medications prior to the period the crimes occurred. Elliott conducted research on the internet and contacted Dr. Logan to discuss whether an SSRI defense would be a viable option in Movant's case. Elliott acquired Dr. Hachinsky's records and information from Movant about alleged changes in his behavior due to the medication. Elliott also attempted to corroborate Movant's alleged behavior by speaking to Movant's coworkers but was unsuccessful.

Elliott and Muller met with Dr. Logan to discuss the particulars of the defense. Elliott was prepared to discuss Dr. Hachinsky's records and the information Movant provided about the purported changes in his behavior, but she did not do so because

24

Dr. Logan "cut it off at the pass." Elliott testified that Dr. Logan told her the SSRI defense was not viable because the crimes required planning and there was another person involved in the crimes at the time they occurred. Elliott indicated she was surprised at how dismissive Dr. Logan was regarding the defense. Dr. Logan further indicated the SSRI defense would not be viable mitigating circumstance evidence. Elliott stated Dr. Logan did not solicit any additional information about Movant's behavior while on the SSRI medication because too much time had elapsed between the ingestion of the medication and the death of the victims.

Muller testified at the evidentiary hearing that she attended the meeting with Elliott and Dr. Logan to discuss the SSRI defense. Muller testified they brought a document Movant prepared with information about his claim that the SSRI medication affected his mental state and gave it to Dr. Logan. Muller echoed Elliott's testimony that Dr. Logan indicated that the SSRI defense was not viable because Movant had a codefendant and had planned the murders. Jacquinot also testified that given the time periods and Movant's actions, Jacquinot did not feel the SSRI medication was a prime motivator in Movant's actions. After Jacquinot felt the SSRI defense was explored fully, the defense team abandoned it.

After Movant was convicted, Dr. Logan assessed Movant again for the post-conviction case. Dr. Logan claimed the information he had access to post-trial was different than the pretrial information because it was "more detailed," noting Movant was being treated with medication for bipolar I disorder and his thoughts were more organized. Dr. Logan testified that when a person takes an SSRI medication, the drug

25

can ease nerve transmissions and have the clinical effect of alleviating depression. In a small percentage of patients, the drug can cause a phenomenon wherein the patient becomes manic or exhibits mania symptoms when bipolar disorder is present. Some individuals have a worsening of symptoms, including suicide and violence, while taking these mediations.

Dr. Logan testified that he told the defense team the SSRI medication aggravated Movant's condition and likely made him exhibit symptoms of mania. While Dr. Logan agreed that the SSRI defense was not viable, he believed the defense team confused the SSRI defense with a phenomenon called "switching." Dr. Logan explained that "switching" occurs when "someone gets an antidepressant -- it doesn't even have to be an SSRI antidepressant -- and it causes them to switch from a state of depression to mania." Dr. Logan stated that "switching" is different from the SSRI defense because the patient need not take a specific type of antidepressant; instead, "switching" is a phenomenon that occurs with patients who have bipolar disorder. Dr. Logan believed Movant was experiencing episodes of "rapid cycling" and that prescribing SSRI medication without a mood stabilizer triggered further manic symptoms in late March 2006. Dr. Logan conceded that Movant initiated the idea of presenting an SSRI defense and sent Dr. Logan articles about "switching" and "rapid cycling."

The motion court found Dr. Logan's testimony about the defense team confusing the concepts of the SSRI defense and "switching" to be noncredible. Dr. Logan repeatedly testified in a deposition prior to the evidentiary hearing that he did not recall the specific conversation with Elliott or his attempt to explain the difference between the

26

SSRI defense and "switching." The motion court noted, "Dr. Logan exhibited a poor and inaccurate recollection of events, many of which he testified to in a definitive manner, only to be later impeached and admit that he was in error." The Court will defer to the motion court's superior opportunity to assess witness credibility and its attendant factual findings. *Zink*, 278 S.W.3d at 178. The motion court also found Dr. Logan's testimony that he attempted to discuss the differences to be "completely and utterly non-credible" because there was "no credible evidence that the issue of 'switching' was ever raised by Dr. Logan at *any* time prior to trial …." The motion court's assertion is borne out by the record.

In addition to outlining why Dr. Logan was not a credible witness, the motion court determined that had Dr. Logan been called as a witness at trial, his testimony on this specific issue would not have provided unqualified support for Movant's defense, but "it may have substantially damaged it." Further, the record demonstrated Dr. Logan had Dr. Hachinsky's treatment records prior to trial, was aware of Movant's prescriptions and that Movant potentially was suffering from bipolar I disorder at that time, but dismissed the defense outright. Finally, the motion court determined that Elliott's and Muller's recollections of their pretrial meeting with Dr. Logan to discuss the SSRI defense were credible.

The record reflects Movant did not present evidence at the evidentiary hearing to support his claim that he was involuntarily intoxicated at the time of Spicer's murder. Accordingly, Dr. Logan's testimony would not have provided a viable defense. Trial counsel were not ineffective for failing to present Dr. Logan's testimony regarding the

27

SSRI medication after fully investigating the issue.  The motion court did not clearly err in overruling Movant's *pro se* claim on this issue.

## Points VII and VIII – Preparing Movant to Testify

Movant's final two points concern his right to testify and trial counsel's effectiveness in preparing him to testify in both the guilt and penalty phases of the trial. Movant raised these claims in his *pro se* attachment to the amended Rule 29.15 motion.

The decision whether to exercise the right to testify rests exclusively with the defendant.  *Jones v. Barnes*, 463 U.S. 745, 751, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983). As a general matter, "an attorney's advice regarding whether or not a defendant should testify is a matter of trial strategy."  *State v. George*, 937 S.W.2d 251, 257 (Mo. App. E.D. 1996).  When defendants later claimed ineffective assistance of counsel regarding such advice, appellate courts have held that "[b]arring exceptional circumstances, such a claim is not a ground for relief."  *Id*.; *State v. Williams*, 853 S.W.2d 371, 378 (Mo. App. E.D. 1993); and *Kenney v. State*, 46 S.W.3d 123, 129 (Mo. App. W.D. 2001).

*Preparing Movant to Testify During the Guilt Phase of Trial*

Movant maintains the motion court clearly erred in denying his *pro se* claim that trial counsel were ineffective for failing to themselves prepare for Movant to testify or prepare Movant to testify and for failing to call Movant as a witness at trial.  Movant argues trial counsel ignored Movant's repeated assertions that he "wanted to be heard." Movant believes trial counsel should have understood that it was important that questions be prepared prior to trial and Movant be advised as to the proper topics of testimony.

28

Movant claims that had trial counsel prepared Movant to testify, Movant would have been able to testify in the guilt phase, rather than be forced invoke his right to not testify.

The record reflects that at the conclusion of the state's evidence, the circuit court extensively examined Movant about his right to testify. Movant stated repeatedly that he "wanted to be heard" and that trial counsel would not ask the questions Movant wanted posed during his testimony. The circuit court explained to Movant that defense counsel was bound by the rules of evidence and Movant could not take the stand to provide narrative testimony. The circuit court allowed Movant to consult privately with trial counsel for an extended period of time prior to announcing whether he wished to testify during the guilt phase. When trial resumed, Movant indicated his frustration at the fact that trial counsel would not ask the questions Movant wanted asked. Movant stated, "I do not want to testify … [b]ecause I would be testifying to basically just what the prosecution wants."

Jacquinot testified at the evidentiary hearing that Movant expressed to him on many occasions that he "wanted to be heard" during the guilt phase of the trial and they discussed the possibility of Movant testifying "weeks in advance" of trial. When Jacquinot tried to explore what Movant meant by "wanting to be heard," Movant provided no specific information. Jacquinot admitted there was little preparation for Movant's guilt phase testimony because the defense team could not get to the point of discussing specific topics with Movant. Jacquinot testified that he never told Movant he could not testify during the guilt phase. The motion court found this testimony credible. Moreover, the record refutes this claim because Movant was apprised fully of his right to

testify and made the knowing and voluntary decision to waive that right during the guilt phase. *See Davis*, 318 S.W.3d at 637.

Even if trial counsel were ineffective for failing to prepare Movant to testify during the guilt phase, Movant has suffered no prejudice. To determine prejudice, courts inquire whether the defendant expressed a desire to testify, what the substance of the defendant's testimony would have been, whether trial counsel misled the defendant about his or her right to testify, and whether the defendant was not informed of the right to testify at all. *Kenney*, 46 S.W.3d at 129. Movant was informed of his right to testify, expressed a desire to do so prior to waiving that right, and was not misled by Jacquinot regarding his right to testify. However, Movant did not testify at the evidentiary hearing to explain what the substance of his testimony would have been had he taken the stand in his defense. There was also ample evidence in the record regarding Movant's lack of cooperation with trial counsel that prevented them from formulating appropriate topics for questioning during the guilt phase. Trial counsel will not be found ineffective due to a client's failure to cooperate in the case. *State v. Brown*, 902 S.W.2d 278, 298 (Mo. banc 1995). The motion court did not clearly err in ruling on this issue.

*Preparing Movant to Testify During the Penalty Phase of Trial*

Movant argues the motion court clearly erred in denying his claim that trial counsel were ineffective, in that by failing to prepare Movant for guilt phase testimony, trial counsel inhibited Movant's ability to give coherent penalty phase testimony. Movant argues that had he presented coherent penalty phase testimony, there is a reasonable probability that he would not have been sentenced to death.

30

The circuit court made an extensive record during the penalty phase regarding Movant's right to testify and his desire to be questioned in a certain manner. Movant indicated he could not get trial counsel to ask the questions Movant wanted asked. The circuit court explained repeatedly that trial counsel were bound by the rules of evidence and relevancy to determine what questions were appropriate to be posed during Movant's testimony and that Movant would be subject to cross-examination by the state. Movant was given time to consult with trial counsel about whether to testify. Jacquinot recommended Movant not testify; however, Movant indicated he wished to act against that advice and take the stand. The circuit court explained that trial counsel would make the decision of what questions to ask, and Movant agreed to testify under those guidelines. Movant was then granted additional time to provide trial counsel with questions he wanted asked during the penalty phase.

While Movant's penalty phase testimony was disjointed at times and nonresponsive to the questions asked, Movant was able to put forth some testimony regarding the abuse he suffered as a child and adolescent. Movant admitted he had difficulty disclosing information to people he did not trust, which included the defense team and prior therapists. Movant also briefly testified to seeing Dr. Hachinksy in the months leading up the murders and feeling as though he was "wound real tight."

"Defense counsel has wide discretion in determining what strategy to use in defending his or her client." *Worthington v. State*, 166 S.W.3d 566, 578 (Mo. banc 2005). "[T]he tactical decisions as to how to conduct examination of witnesses, including that of the defendant, lie with counsel." *Davis*, 318 S.W.3d at 636.

31

Jacquinot testified he prepared questions for the penalty phase of the trial, wherein he created an outline and "a game plan of where we wanted to go." Jacquinot informed Movant he could not take the stand and start talking about issues. The record demonstrates Movant was allowed time to provide additional questions to Jacquinot prior to testifying. The motion court determined Jacquinot was a credible witness regarding his preparation and attempt to elicit testimony from Movant at trial. This Court defers to this credibility determination.

Further, Movant cannot demonstrate prejudice resulted because Movant did not testify at the evidentiary hearing to put forth any evidence about how he would have changed his penalty phase testimony had Jacquinot prepared him more fully or articulate any specific questions he wanted Jacquinot to ask that were not asked. The motion court did not clearly err in overruling this claim.

## Conclusion

The motion court did clearly err in overruling the totality of Movant's Rule 29.15 motion for post-conviction relief after an evidentiary hearing. The motion court's judgment is affirmed.

_____
GEORGE W. DRAPER III, JUDGE

All concur.

32