

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| GARY JOLLEY, | ) | |
| | ) | |
| Appellant, | ) | **WD85522** |
| | ) | |
| v. | ) | **OPINION FILED:** |
| | ) | **October 31, 2023** |
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent. | ) | |

**Appeal from the Circuit Court of Boone County, Missouri**
The Honorable Kevin Crane, Judge

Before Division Four: Gary D. Witt, Chief Judge, Presiding, Alok Ahuja, Judge and W. Douglas Thomson, Judge

Gary R. Jolley ("Jolley") appeals a judgment of the Circuit Court of Boone County, Missouri ("motion court") denying, after an evidentiary hearing, his motion for post-conviction relief pursuant to Rule 29.15.[1] Jolley raises two points on appeal and argues the motion court clearly erred in denying his motion for post-conviction relief because Jolley received ineffective assistance of counsel in violation of his Sixth and Fourteenth

---

[1] All rule references are to the Missouri Supreme Court Rules (2023), unless otherwise noted.

Amendment rights under the United States Constitution, and Article I, Sections 10 and 18(a) of the Missouri Constitution because: Point I, trial counsel failed to call S.W. as a witness; and Point II, trial counsel failed to call A.B. as a witness.[2] We affirm the judgment of the motion court.

## Factual and Procedural Background[3]

Jolley was convicted of unlawful use of a weapon, first-degree burglary, first-degree domestic assault, third-degree domestic assault, second-degree child endangerment, and two counts of armed criminal action following a jury trial and was sentenced to a combined total of thirty years' imprisonment. Jolley appealed his convictions and sentences. *State v. Jolley*, 608 S.W.3d 777 (Mo. App. W.D. 2020). Our *per curiam* order summarized the facts of the underlying criminal case as follows:

> Jolley and his wife, victim J.J., were married on May 19, 1977. They had five children and ten grandchildren, including victims F.S., who was sixteen at the time the charges arose, and K.J., who was then six months old and living with Jolley and J.J. Throughout their relationship, Jolley was frequently abusive to J.J., both physically and mentally. On August 8, 2016, Jolley was holding K.J. when he approached J.J., spit in her face, and repeatedly yelled, "fuck you," in J.J.'s face, causing K.J. to begin crying. J.J. told Jolley to give K.J. to her, but Jolley refused and instead took K.J. outside and put her in a swing, where K.J. eventually fell asleep. Jolley refused to allow J.J. to hold K.J. for most of the day until bedtime when he finally allowed J.J. to feed K.J. and put her to bed. That night, J.J. decided that she had had enough and did not want to raise K.J. in that environment, so she planned to leave Jolley the next day by going to a doctor's appointment with

---

[2] Pursuant to section 509.520, RSMo 2023, we do not use any victim or witness names other than parties in this opinion.

[3] "On appeal from the motion court's ruling on a Rule 29.15 motion, we view the evidence in the light most favorable to the verdict in the underlying criminal case." *Martin v. State*, 655 S.W.3d 195, 197 n.2 (Mo. App. W.D. 2022) (citation omitted).

K.J. and not returning home. After the appointment, J.J. and K.J. stayed with a friend of J.J.'s daughter, where they believed Jolley would not go looking for them.

The following Saturday, August 13, 2016, J.J. ran into Jolley at some local softball fields where she was watching one of her grandchildren play. Jolley tried to convince J.J. to get into the car with him, but she refused, and Jolley became angry and drove off. Around 2:00 p.m., Jolley called his daughter, [G.T.], and warned her, "Something bad is going to happen to you." Later that evening, several members of Jolley's family were gathered at the home of [G.D. and C.D., who is one of Jolley's daughters] to celebrate the seventh birthday of a family friend. Around 8:00 p.m., [G.D.] was in the garage, getting ready to take his motorcycle out for a ride, when he saw Jolley drive up. [G.D.] asked Jolley how he was doing, but Jolley ignored him and retrieved an assault rifle and pistol from his trunk. As Jolley walked away from his vehicle, [G.D.] followed, trying to figure out what was happening. Jolley turned, pointed one of the guns at [G.D.], and advised [G.D.] that the assault rifle was "for what he came to do and if anybody got in his way" and "that the pistol was for him [Jolley] afterwards." [G.D.] immediately ran to the back porch to warn everyone that Jolley was there and that he had guns. J.J., who had been sitting on the back porch with several children, decided to take K.J. inside the house until Jolley left.

Jolley walked up to the back porch, holding the rifle. [S.D.], who thought of Jolley as a grandfather, said, "Hi, Grandpa," and Jolley responded, "I'm not your grandpa today." [C.D.] asked Jolley, "Daddy, what are you doing?" [C.D.'s] daughter entered the home from the back porch through sliding glass doors and locked them. As Jolley approached, he said nothing in response to [C.D.], but she noticed a bag of ammunition in his hand, and she took it from him, demanding again to know what he was doing. Jolley responded by pointing the rifle at her chest and saying, "Get the hell out of my way" and "I'll kill you too." [C.D.] dropped the bag of ammunition and ran.

After taking stock of where everyone had gone, [C.D.] returned to the back porch to retrieve her cell phone, where she again encountered Jolley. She again pleaded with him, saying, "Dad, what are you doing?"; "Calm down. This is stupid. Stop." Jolley again responded by pointing the rifle at her chest, this time with his finger on the trigger, saying, "I told you, stay the fuck out of my way or I'll kill you." [C.D.] again ran to the woods, where

3

she contacted 911; while she was on the phone, she heard a shot, followed by breaking glass from Jolley shooting at the sliding glass door. Jolley used the butt of the rifle to break more glass out of the door so that he could enter into the home. [C.D.] then saw [G.D.] arguing with Jolley, after which, Jolley pointed the rifle at [G.D.] and shot. [G.D.] fled to the woods.

J.J., who was holding K.J., went to a back bedroom, along with F.S., and J.J.'s daughter, [S.W.], where F.S. held the door shut and [S.W.] called 911. Jolley was pounding on the bedroom door, yelling that he was going to kill J.J. After a couple of unsuccessful attempts to enter, Jolley shot the door handle that F.S. was holding, injuring F.S.'s hand, and he was able to enter the room. Jolley told F.S. that he was going to kill J.J. and then himself. J.J., fearing for K.J.'s safety in J.J.'s arms, set K.J. down on the bed. Jolley continually shouted that he was going to kill J.J. Jolley kept pointing his rifle at J.J., but F.S. kept stepping between them, telling Jolley, "you're not going to hurt my grandma." Jolley advised F.S., "Get the fuck out of my way, or I'll kill you too." J.J. had retrieved a pistol from the bedroom closet, but was unable to use it on Jolley because she feared striking F.S.

At one point, Jolley pointed the rifle at F.S.'s chest, but F.S. managed to push the rifle down and tried to wrestle it away from Jolley. Three shots were fired while F.S. wrestled with Jolley, causing burns to F.S.'s arm. F.S. eventually wrested the gun away from Jolley and knocked him to the ground, and J.J. and [S.W.] then jumped on him and held him down. Jolley continued to spew hateful statements at the women, calling them bitches, saying he hated J.J., and continuing his threats to kill her. While J.J. and [S.W.] held Jolley down, F.S. took K.J. and ran out of the home. Once J.J. realized the police had arrived, she and [S.W.] decided that J.J. should make a run for it to let the police in, while [S.W.] continued to restrain Jolley.

Eventually, officers directed [S.W.] to come out and they went in. Inside the home, they found Jolley, who initially resisted the officers, but they were able to physically overcome him and place him into handcuffs.

This Court affirmed his conviction and sentence, and issued its mandate on November 4, 2020. Jolley filed a timely *pro se* motion for post-conviction relief pursuant to Rule 29.15. Jolley's appointed counsel filed a timely amended motion. The amended motion asserted a claim of ineffective assistance of appellate counsel, ineffective assistance

4

of trial counsel, and incorporated three of Jolley's *pro se* claims. Jolley alleged his trial counsel was ineffective for failing to call S.W., A.B., and C.F. as witnesses because their testimonies would have contradicted the State's witnesses and would have established the allegations against him were fabricated. Jolley asserted these witnesses would have testified that while he was in jail awaiting trial, the State's witnesses had stolen significant items of his personal property, sold it for less than it was worth, cashed and spent his disability checks, and conspired to create the allegations against Jolley in order to prevent him from recouping his property. Jolley stated he gave trial counsel the witnesses' contact information, but trial counsel did not contact or reasonably investigate their testimony.

On April 29, 2022, an evidentiary hearing was held. S.W., A.B., and C.F. testified. S.W. and A.B., Jolley's daughters, testified that while Jolley was in jail some of Jolley's family members who testified against him at trial, including C.D., sold items of Jolley's property and kept the proceeds. S.W. and A.B. testified that C.D. used up to three years' worth of Jolley's social security disability payments for her own use. S.W. and A.B. stated they were never contacted by Jolley's attorney, but they both would have testified at trial if they were contacted. A.B. was not present the night of the incident, but S.W. was at the house. On cross-examination, S.W. testified she made several 911 calls when Jolley entered the house with a gun. During one call, she told police "He's trying to kill us." S.W. testified that Jolley pointed the gun at her mom and Jolley assaulted S.W. by striking her in the head, punching her in the face, and trying to pull out her earring and nose ring. Jolley testified at the evidentiary hearing. Jolley stated he discussed with his attorneys calling S.W., A.B., and C.F. as witnesses. Jolley told his trial counsel he wanted these

5

witnesses "[b]ecause they seen what was going on. They came to visit me. They seen what kind of shape/condition I was in." Jolley stated he told his attorneys about the false claims made by the witnesses against him.

One of Jolley's previous trial attorneys, J.P., also testified at the evidentiary hearing. J.P. represented Jolley until D.M. ("trial counsel") came onto the case.[4] J.P. testified he met with Jolley repeatedly and they discussed possible defense witnesses. S.W.'s name came up when discussing the case and the surrounding context, but J.P. did not recognize A.B.'s name. J.P. did not recall specifically if Jolley wanted to call S.W. or why Jolley would want her called. J.P. testified that he was sure Jolley brought up the situation about his property being sold, "among a list of a number of grievances [Jolley] had with the people in his life and his family."

On June 1, 2022, the motion court issued findings of fact, conclusions of law, and judgment denying Jolley's motion for post-conviction relief.[5] This appeal follows.

## Standard of Review

"When reviewing the motion court's denial of a post-conviction relief motion, this Court presumes the motion court's ruling is correct." *McIntosh v. State*, 413 S.W.3d 320, 323 (Mo. banc 2013). Our review of the trial court's action on a Rule 29.15 motion "shall be limited to a determination of whether the findings and conclusions of the trial court are clearly erroneous." Rule 29.15(k). A motion court's findings and conclusions are clearly

---

[4] Jolley was also represented by attorney D.M., but D.M. passed away prior to the evidentiary hearing.

[5] The motion court noted that although trial counsel did not testify at the hearing, because he was deceased, Jolley's burden to prove ineffective assistance of counsel remained the same.

erroneous only if, "after a review of the entire record, the reviewing court is left with the definite and firm impression that a mistake has been made." *Wooten v. State*, 654 S.W.3d 904, 910 (Mo. App. E.D. 2022) (internal quotation marks omitted).

**Analysis**

Jolley argues the motion court clearly erred in denying his motion for post-conviction relief because he received ineffective assistance of trial counsel in violation of his rights to due process and the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 18(a) of the Missouri Constitution, because: Point I, trial counsel failed to call S.W. as a witness; and Point II, trial counsel failed to call A.B. as a witness. For ease of analysis, Point I and Point II will be addressed together.

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to counsel.[6] U.S. Const. amend. VI; *see Gideon v. Wainwright*, 372 U.S. 335, 342 (1963) (holding the Due Process Clause of the Fourteenth Amendment guarantees the right to counsel for state defendants). The right to counsel is "the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To be entitled to post-conviction relief for the ineffective assistance of counsel, a movant must show by a preponderance of evidence that: (1) counsel failed to exercise the level of skill and diligence that a reasonably competent trial counsel would in a similar situation, and (2) the movant was prejudiced by that failure. *Shockley v. State*, 579 S.W.3d 881, 892

---

[6]Missouri's Constitution similarly provides a criminal defendant "shall have the right to appear and defend, in person and by counsel." Mo. Const. art. I, sec. 18(a).

(Mo. banc 2019) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). "To prevail on a claim of ineffective assistance of counsel for failure to call a witness, the movant must demonstrate: 1) trial counsel knew or should have known of the existence of the witness; 2) the witness could be located through reasonable investigation; 3) the witness would testify; and 4) the witness's testimony would have produced a viable defense." *McIntosh v. State*, 413 S.W.3d 320, 328 (Mo. banc 2013) (internal quotation marks and alterations omitted). Trial counsel's decision to not call a witness is presumptively a strategic choice and "will not support a claim of ineffective assistance of counsel unless the defendant clearly establishes otherwise." *Id.* Counsel's failure to call a witness only amounts to ineffective assistance of counsel if the witness's testimony "unqualifiedly supports Movant." *Martin v. State*, 655 S.W.3d 195, 200 (Mo. App. W.D. 2022) (alterations omitted).

Jolley has failed to demonstrate he received ineffective assistance of counsel due to trial counsel's failure to call S.W. and A.B. as witnesses. First, trial counsel knew or should have known the existence of S.W. and A.B. because they are Jolley's daughters, and S.W. was originally listed as a State witness. Further, S.W. and A.B. both could be located through reasonable investigation as they were present during the trial and were willing to testify at trial. Jolley, however, has failed to demonstrate that S.W.'s and A.B.'s testimonies would have produced a viable defense. At trial, Jolley's trial counsel asserted the defense of diminished capacity. The testimonies of S.W. and A.B. were not going to unqualifiedly support this defense, but rather would have drawn attention to the conduct of testifying family members to show their alleged biases against Jolley. Jolley asserts S.W.'s and A.B.'s

8

testimonies about C.D.'s conduct would have illustrated her bias toward Jolley and her motivation to testify falsely against him. According to Jolley, C.D.'s bias against him was directly relevant to the jury's determination of key elements of the crimes, and thus, there is a reasonable probability the outcome of at least one of the counts would be different. We disagree.

While the interest or bias of a witness is always relevant, *see Dodson v. Ferrara*, 491 S.W.3d 542, 565 (Mo. banc 2016), the motion court did not find the testimonies from S.W. and A.B. to be credible and noted the testimonies involved speculation and were of minimal relevance. *See Davis v. State*, 486 S.W.3d 898, 905 (Mo. banc 2016) ("This court defers to the motion court's superior opportunity to judge the credibility of witnesses.") (internal quotation marks omitted). Thus, we defer to the motion court's findings that S.W. and A.B. were not credible witnesses.

Jolley argues the situation here is similar to that presented in *Smith v. State*, 370 S.W.3d 883 (Mo. banc 2012). In *Smith*, trial counsel did not investigate or call as a witness the codefendant of the crime who would have testified the defendant was not involved in the crime. *Id.* at 884. At the evidentiary hearing, trial counsel testified he assumed the codefendant's testimony would be bad for the defendant, but even if it was helpful, he believed the State would impeach the witness. *Id.* at 886. While strategic decisions of trial counsel often should not be challenged, in *Smith* the Court found trial counsel to be ineffective because he failed to call as a witness or investigate the codefendant whose credible testimony reasonably could have changed the outcome of the defendant's trial. *Id.*

9

The unique circumstances of *Smith* are not present in this case. Unlike in *Smith* where there was a reasonable probability the witness's credible testimony would change the outcome of trial, there is no reasonable probability S.W.'s and/or A.B.'s testimony would have changed the result. Here, the motion court did not find the witnesses' testimonies to be credible. While the witness's testimony in *Smith* would have unqualifiedly supported the defendant, that is not the case here. Neither S.W.'s nor A.B.'s testimony would have supported the diminished capacity defense presented at trial. Additionally, the testimony from these two witnesses would not have produced a different viable defense because they were about the conduct of Jolley's family members after the crimes had been committed, while Jolley was in jail awaiting trial. Rather, S.W.'s proposed testimony would have confirmed what the State's witnesses established because S.W. discussed Jolley entering the home armed, pointing the gun at S.W.'s mother, and assaulting S.W.

Jolley has failed to overcome the presumption of reasonable trial strategy and failed to demonstrate he was prejudiced by trial counsel's decision to not call S.W. and A.B. as witnesses. *See Anderson v. State*, 564 S.W.3d 592, 601 (Mo. banc 2018) ("Prejudice occurs when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.") (internal quotation marks omitted). As this Court found on direct appeal, there was overwhelming evidence of guilt, and thus, there is no reasonable probability that the result of the Jolley's trial would have been different if S.W. and/or A.B. had testified. There was ample physical evidence of the crimes, as officers arrested Jolley in the house immediately after the crimes, they found

10

weapons, ammunition, bullet casings, bullet holes and bullet fragments throughout the house, and they spoke with an injured victim. Further, after the incident and while in jail, Jolley made statements in phone conversations admitting he committed the offenses. The testimony of S.W. and A.B. would not have changed the outcome of the trial. Therefore, the motion court's judgment was not clearly erroneous.

Point I and Point II denied.

### Conclusion

We affirm the judgment of the motion court.

_____
Gary D. Witt, Judge

All concur

11