

# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| **JOSEPH T. SOUSLEY,** | ) | |
| | ) | **WD85175** |
| Appellant, | ) | |
| **v.** | ) | **OPINION FILED:** |
| | ) | |
| **STATE OF MISSOURI,** | ) | **June 27, 2023** |
| | ) | |
| Respondent. | ) | |
| | ) | |

**Appeal from the Circuit Court of Buchanan County, Missouri
The Honorable Daniel Fred Kellogg, Judge**

**Before Division Two:  Alok Ahuja, Presiding Judge,
Anthony Rex Gabbert, Judge and Thomas N. Chapman, Judge**

Joseph Sousley ("Sousley") appeals a judgment of the Circuit Court of Buchanan County, which denied his Rule 29.15 motion for postconviction relief after an evidentiary hearing.  Sousley raises six points on appeal, arguing that the motion court erred in denying relief on various claims of ineffective assistance of trial and appellate counsel.  Sousley contends he received ineffective assistance when his trial counsel failed to object and argue to exclude testimony, failed to investigate and present evidence for impeachment purposes, and failed to object to

the verdict directors for Count I and Count III. Sousley contends he further received ineffective assistance when his appellate counsel on direct appeal failed to raise plain error claims regarding the verdict directors for Counts I and III. The judgment is affirmed.

## Background[1]

The facts underlying Sousley's convictions of three counts of first-degree sodomy and one count of first-degree sexual abuse are as follows. Victim, Sousley's niece, lived in St. Joseph, Missouri, with her mother. In the summer of 2016, when Victim was fourteen years old, she spent a week at the house of her grandfather ("Grandfather") in Climax Springs, Missouri. At the time, Sousley also lived with Grandfather. During Victim's time at Grandfather's house, Sousley and Victim went on an overnight trip to complete a job for Sousley's moving company. While in the van, Sousley asked Victim questions about her sexual experiences. Sousley then groped Victim's breasts and placed her hand on his clothed crotch. Victim felt that Sousley was erect. Sousley pulled onto the side of a gravel road and parked the van. The two went to the back of the van where

---

[1] "On appeal from the motion court's ruling on a Rule 29.15 motion, we view the evidence in the light most favorable to the verdict in the underlying criminal case." *State v. Sprofera*, 613 S.W.3d 822, 824 n.2 (Mo. App. W.D. 2020) (quoting *Hutton v. State*, 345 S.W.3d 373, 374 n.1 (Mo. App. W.D. 2011)). Portions of the facts are adopted from this court's unpublished memorandum opinion that accompanied the order issued in *State v. Sousley*, 616 S.W.3d 435 (Mo. App. W.D. 2020).

Sousley removed Victim's pants. Sousley then inserted his fingers in Victim's vagina and placed his mouth on her vagina. Sousley stopped after he said he saw a light turn on in a nearby house. They returned to the front of the van, and Sousley drove away. Sousley commented to Victim that "what happens in the van stays in the van." At some point, he commented that he would not have done something similar with Victim's sister, because her sister talks a lot and would say something.

Later in the summer of 2016, Sousley stayed a week at Victim's mother's house to help Victim's mother pack her belongings for a planned move. While staying at the house, Sousley made more sexual comments toward Victim. Sousley placed his penis in Victim's mouth several times. At some point during the week, Sousley inserted his fingers in Victim's vagina. On another occasion, Sousley stuck his fingers in Victim's vagina, which was painful and caused her to start bleeding. Sousley also placed his mouth on Victim's breasts, bruising her.

In 2017, Victim informed her mother of Sousley's conduct following an argument with her mother. Victim's mother contacted local law enforcement. An investigation was conducted. Sousley was charged with three counts of first-degree sodomy and one count of first-degree sexual abuse for the conduct

occurring in St. Joseph, Missouri.[2]  Jury trial began on May 6, 2019.  The jury

convicted Sousley on all four counts.[3]

Sousley filed a direct appeal, raising ten allegations of error.  This court

affirmed Sousley's convictions.

Sousley then filed a *pro se* Rule 29.15 motion.  Appointed counsel timely

filed an amended motion, which asserted various claims that Sousley had received

ineffective assistance of counsel from his trial and appellate counsel.  The motion

court held an evidentiary hearing during which testimony was received from

Sousley's trial counsel and Grandfather.  Sousley also submitted a number of

exhibits at the hearing, including deposition testimony from Sousley, Sousley's

appellate counsel, Sousley's stepdaughter, a customer of Sousley's moving

company, as well as other exhibits related to Sousley's postconviction claims.

Following the evidentiary hearing, the motion court issued a judgment denying

relief on each of Sousley's claims.

Sousley now appeals to this court.

---

[2] Sousley was not charged for the conduct occurring in the van on the way to the moving job.

[3] Trial had previously been set for February 20, 2018, but Sousley failed to appear.

## Standard of Review

We review a motion court's judgment denying relief on a Rule 29.15 postconviction motion to determine whether the motion court's findings and conclusions are clearly erroneous. Rule 29.15(k); *Meiners v. State*, 540 S.W.3d 832, 836 (Mo. banc 2018). A judgment is clearly erroneous only if we are "left with a definite and firm impression that a mistake has been made." *Meiners*, 540 S.W.3d at 836 (citation omitted). "The movant has the burden of proving all allegations by a preponderance of the evidence." *Id.*; Rule 29.15(i).

To be entitled to postconviction relief based on ineffective assistance of counsel, the movant must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The movant must establish that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defendant. *Id.* If a movant makes an insufficient showing on either prong of the *Strickland* test, the movant's claim of ineffective assistance of counsel must be denied, and it is unnecessary to address the other prong. *Id.* at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

To establish that counsel's performance was deficient, the movant must show "that counsel's representation fell below an objective standard of

reasonableness." *Id.* at 688. The movant must overcome the "strong presumption that trial counsel's conduct was reasonable and effective." *Hosier v. State*, 593 S.W.3d 75, 81 (Mo. banc 2019) (quoting *Davis v. State*, 486 S.W.3d 898, 906 (Mo. banc 2016)). To overcome this presumption, "a movant must identify specific acts or omissions of counsel that, in light of all the circumstances, fell outside the wide range of professional competent assistance." *Id.* "The question in an ineffective assistance claim is not whether counsel could have or even, perhaps, should have made a different decision, but rather whether the decision made was reasonable under all the circumstances." *Johnson v. State*, 406 S.W.3d 892, 901 (Mo. banc 2013) (quoting *Henderson v. State*, 111 S.W.3d 537, 540 (Mo. App. W.D. 2003)).

The movant must also "affirmatively prove prejudice." *Strickland*, 466 U.S. at 693. To do so, the movant must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Hosier*, 593 S.W.3d at 81 (quotation omitted).

## Point One

In his first point, Sousley argues that the motion court erred in denying relief on his claim of ineffective assistance of counsel because his counsel's performance

was unconstitutionally deficient when counsel failed to move to exclude the entirety of the testimony of Dr. Terra Frazier, a child abuse pediatrician, as irrelevant. In his amended Rule 29.15 motion, Sousley alleged that he had received ineffective assistance of counsel when his counsel "failed to adequately investigate, object, and argue to exclude Dr. Frazier's testimony." Sousley alleged further that if his counsel had adequately investigated, objected, and argued that Dr. Frazier's testimony was inadmissible as irrelevant, there is a reasonable probability that the outcome of the trial would have been different. In support of the claim, Sousley noted that Dr. Frazier testified at trial about her examination of Victim and her diagnosis of Victim with child sexual abuse. Sousley argued that this testimony was neither logically nor legally relevant and that counsel could have filed a motion *in limine* to prevent Dr. Frazier from testifying altogether.

At the evidentiary hearing, Sousley's trial counsel testified that he had objected to Dr. Frazier's testimony regarding her diagnosis of child sexual abuse because he did not want that diagnosis in evidence, but that his objection was overruled. Trial counsel further testified that he believed that there was some strategic value in allowing the jury to hear the portions of Dr. Frazier's testimony which indicated that there were no physical signs of abuse. On cross-examination trial counsel further limited the significance of Dr. Frazier's diagnosis of child

7

sexual abuse by eliciting an admission from Dr. Frazier that her diagnosis was 'based entirely on the disclosure' by Victim, which Dr. Frazier presumed to be true as part of her standard practice. Counsel's cross-examination at trial thus made it clear that Dr. Frazier's diagnosis was not based on any physical evidence (as there was none), or on any independent analysis or judgment on Dr. Frazier's part regarding whether the acts disclosed by Victim had occurred.

In rejecting Sousley's claim, the motion court found that trial counsel did make an objection to the relevance of Dr. Frazier's diagnosis of child sexual abuse. The motion court also found that trial counsel had strategic reasons for allowing some of Dr. Frazier's testimony, and that reasonable trial strategy decisions do not form the basis for postconviction relief.

On appeal, Sousley argues that his counsel's objection toward the end of Dr. Frazier's testimony was inadequate to exclude Dr. Frazier's testimony altogether. Sousley argues that counsel should have filed a pretrial motion *in limine* to exclude the entirety of Dr. Frazier's testimony, and that such a motion would have been granted and would have prevented Dr. Frazier from testifying altogether.[4] Sousley argues that he received ineffective assistance of counsel due to counsel's failure to

---

[4] Although Sousley argues that a successful pretrial motion *in limine* would have prevented Dr. Frazier from testifying at trial, "a ruling on a motion in limine is interlocutory and subject to modification at trial." *State v. Blurton*, 484 S.W.3d 758, 775 (Mo. banc 2016).

8

file such a pretrial motion, and that the motion court clearly erred in rejecting his claim. We disagree.

The motion court's findings and conclusions are not clearly erroneous. The transcripts indicate that trial counsel objected multiple times during Dr. Frazier's testimony on the grounds of relevance. These objections were overruled. Moreover, counsel testified that parts of Dr. Frazier's testimony held strategic value for the defense. The motion court found counsel's strategy reasonable. This finding is not clearly erroneous. The record indicates that counsel objected to the portions of Dr. Frazier's testimony that he found were harmful to the defense, and did so in an anticipatory fashion, well in advance of such portions being introduced into evidence. Counsel's objections were overruled. The fact that counsel's objections were unsuccessful does not establish that counsel's performance "fell outside the wide range of professional competent assistance." *Hosier*, 593 S.W.3d at 81.[5]

---

[5] Moreover, there is a more fundamental problem with Sousley's claim. Sousley argues that, even though counsel objected multiple times during the course of Dr. Frazier's testimony on the grounds of relevance, and even though counsel's objections were overruled, that counsel was unconstitutionally deficient for failing to attempt to exclude the entirety of her testimony on the same grounds on which he was unable to exclude portions of the testimony. On this record there is no reason to believe that counsel could have successfully excluded the entirety of Dr. Frazier's testimony on the same grounds as counsel unsuccessfully attempted to exclude portions of Dr. Frazier's testimony. Sousley's claim in this appeal essentially tries to transform an allegation of trial court error (regarding the trial court's admission of the Frazier testimony) into one of ineffective assistance of counsel, in an attempt litigate the relevance of Dr. Frazier's testimony in

Point one is denied.

## Point Two

In his second point on appeal, Sousley argues that his trial counsel was unconstitutionally ineffective because counsel failed to adequately investigate and adduce evidence to impeach Victim's testimony regarding an uncharged incident of abuse that occurred during a moving job.

To prove ineffective assistance of counsel based on failure to call a witness or present evidence, a movant must show (1) trial counsel knew or should have known of the existence of the witness or evidence; (2) the witness or evidence could be located through reasonable investigation; (3) the witness would testify or the evidence would be admissible; and (4) the witness's testimony or evidence would have produced a viable defense. *See Glass v. State*, 227 S.W.3d 463, 468 (Mo. banc 2007).

In his amended motion, Sousley argued that his counsel was ineffective for failing to investigate and present evidence to impeach Victim's credibility. Specifically, Sousley argued that evidence should have been presented at trial which would have contradicted details provided in Victim's testimony regarding

---

postconviction proceedings after already having had the opportunity to assert trial court error in his direct appeal.

the circumstances of the prior uncharged conduct that Victim testified occurred when she went with Sousley to assist with a moving job.

At trial, the State presented evidence of uncharged acts of abuse by Sousley toward Victim that occurred prior to the charged conduct. Victim testified that these uncharged acts occurred when she went with Sousley to assist on a moving job for Sousley's moving company. Victim testified that she was staying at Grandfather's house when she and Sousley left to complete a moving job. Victim's mother testified that no one else went with Victim and Sousley on the trip. Regarding the vehicle Sousley was driving, Victim testified: "It was a white van. It's not like a minivan. I can't describe what – like, it's a white box van." Victim testified that they went to Sousley's house to stay the night, and then went to the jobsite in the morning. Victim testified that she did not know where Sousley's house was but that it felt like a long distance. Victim testified that, on the way to Sousley's house, Sousley began to ask her questions of a sexual nature, that Sousley grabbed her breast and put her hand on his penis over his clothes. Sousley then parked the van on a gravel road, asked Victim to go to the back of the van, took Victim's pants off, put his fingers in her vagina, and put his mouth on her vagina. Sousley stopped when he said he saw a light in a house turn on. Sousley then drove away, and they stayed at Sousley's residence that evening before going

11

on to the moving job the following day. Victim testified on cross-examination that Sousley's wife and children were also present at Sousley's house that night, and that Sousley took Victim and Sousley's stepdaughter to go swimming prior to going to the moving jobsite the next morning. Victim testified on cross-examination that there was no doubt in her mind that the abuse occurred in a white van.

Detective Loehner testified that he had interviewed Sousley by phone. Loehner testified that Sousley initially denied that he had ever been alone with Victim. Loehner testified that Sousley later stated that Victim was with him on one moving job along with Grandfather, during which they traveled from Grandfather's house to the jobsite, and then returned to Grandfather's house the next day.

Trial counsel called multiple witnesses at trial, including Sousley's wife, and Grandfather.[6] Regarding the details of the circumstances surrounding the uncharged conduct to which Victim testified, trial counsel elicited testimony from Sousley's wife that she and her husband never visited their old house in Owensville, Missouri during the time Victim was staying at Grandfather's house. Sousley's wife also testified that Sousley did not own or borrow a white van.

---

[6] Defendant Sousley did not testify at the criminal trial.

12

Grandfather testified at the criminal trial that he helped his son with a moving job in Columbia, Missouri, which was about 80 miles from his home in Climax Springs, Missouri. He testified that Columbia was about the same distance from Climax Springs as it was from Owensville. He further testified that Sousley did not own a white van. On cross-examination, Grandfather admitted that he told law enforcement that he did not go on the moving job with Sousley and Victim, and that he had told Victim's mother that she should not have reported Victim's statements about Sousley, but should have "kept it in the family."

In support of his claim of ineffective assistance, Sousley presented testimony in the motion court from Sousley's trial counsel, and Grandfather, as well as numerous exhibits, including an invoice from Sousley's moving company, Sousley's property tax records from Gasconade County regarding the vehicles owned by Sousley on January 1 of 2015 and 2016, a letter from the Owensville Parks and Recreation department regarding when the Owensville swimming pool opened in 2016, a deposition from a customer for whom Sousley performed a moving job in late May 2016, a deposition from Sousley's stepdaughter, a deposition from Sousley, recordings of phone conversations between Sousley and Detective Loehner, and a map showing where various cities in Missouri are located in relation to each other.

At the evidentiary hearing, trial counsel testified that Sousley first informed him during trial that Sousley did not own a white box van, and that trial counsel did not believe, at that late stage, it would have been feasible to get records from the Department of Revenue. Trial counsel testified that he thought it would be best to get evidence in regarding vehicle ownership through the witnesses he had available at trial, and that he tried to make the best of the situation given the late timing of Sousley's disclosure after having discussed the case with Sousley multiple times over a long period of time prior to that.

Regarding Sousley's stepdaughter, trial counsel testified that he could not recall whether he had ever spoken with her. Regarding the customer for a moving job, trial counsel testified that he was never made aware that a moving customer would have any evidence that would contradict the State's evidence.

Regarding the audio recordings of conversations between Sousley and Detective Loehner, trial counsel testified that he recalled that there were recordings of phone conversations between Sousley and Loehner, and that he had listened to those recordings in anticipation of trial. At the evidentiary hearing, trial counsel could not recall whether Loehner testified (at the criminal trial) that Sousley had earlier indicated to Loehner that the moving trip was an overnight trip. When asked about whether he had considered using the recordings to establish that

Loehner had misstated what Sousley had told him, trial counsel indicated that he did not think he caught such a discrepancy while the detective was testifying, and that he would have tried to use the recordings to impeach the detective if there was not something more damaging on the recording.

At the evidentiary hearing, Grandfather indicated that he had been asked to testify (at the criminal trial) about the moving job that Victim helped with, but that he could not then remember, as he was "half-sick".

The records from Sousley's moving company indicated that Sousley's company had performed a moving job for a customer, Bibi Blanco ("Blanco"), in late May of 2016. The Gasconade County property tax records indicated that on January 1, 2016, Sousley and his wife owned a 2004 Ford Excursion and a 2008 Ford Escape. The records did not indicate the color or shape of these vehicles. The letter from the Owensville Parks and Recreation Department indicated that the Owensville Waterpark opened in 2016 on Thursday, May 26, and that the scheduled hours of operation were from 12 p.m. to 6 p.m.

The deposition of Blanco indicated that Blanco had hired Sousley to move her family from her home in Columbia, Missouri to Orlando, Florida. Blanco testified that she and her family had all of their belongings packed up and were waiting on Sousley, but that Sousley never showed up. Blanco called Sousley who

said that he could not help with his moving truck, which caused Blanco and her husband to rent their own truck which they would have to drive to Florida. Sousley later contacted Blanco and offered to help load the truck. Blanco indicated that Sousley showed up the following day with some members of his family. Blanco stated: "I don't remember exactly who. I believe it was three people. I don't know if it was his brother with his sister-in-law and some other guy. I don't know." Blanco stated that Sousley and the other people stayed the whole day to help load the truck. Blanco stated that she believed that of the three people helping Sousley, "[i]t was like one lady for sure" and Blanco thought there were two men as well.

The deposition testimony from Sousley's stepdaughter indicated that she had never gone swimming with Victim or gone on a moving job with Victim.

In his deposition, Sousley testified that he had given his trial counsel records from his moving company regarding a moving job in Columbia, Missouri and had asked him to use the records at trial. Sousley testified that his counsel had explained to Sousley that he had spoken to another attorney at a conference and had received advice "to not include a whole bunch of stuff because it would just confuse the whole situation." Sousley's deposition testimony indicated that the detail regarding swimming on the morning of the moving job came up for the first

16

time at trial. The audio recordings of Sousley's conversation with Detective Loehner indicated that Sousley had told Loehner during the conversation that he left for the moving job with Victim and Grandfather on the day of the move and returned the same day.[7]

Sousley's amended motion acknowledged that trial counsel presented testimony from Grandfather and Sousley's wife at trial to impeach some of the details provided by Victim regarding the uncharged conduct. However, the motion argued that objective proof would have corroborated the testimony of Grandfather and Sousley's wife such that the jury could not have simply assumed that their testimony was biased. The motion also argued that Grandfather should have been asked whether the moving trip was an overnight trip or a day trip, and that trial counsel should have used an audio recording to establish that Sousley had told Detective Loehner that the trip was not an overnight trip.

Following the evidentiary hearing, the motion court denied relief on Sousley's claim. The motion court credited trial counsel's testimony that he was not informed of a vehicle discrepancy until the morning of trial, and that he was

---

[7] The audio recordings also contained numerous references that were the subject of a motion *in limine* filed by Sousley's prior counsel, which sought to exclude references to Sousley doing drugs, references to Sousley hitting his father, references to Sousley having a gun during a dispute with his father, references to Sousley being in prison, references to Sousley being careful or watching himself while around Victim and another girl, references to a woman asking her daughters whether Sousley had touched them, and references to Sousley's penis size.

17

not alerted to contact the moving client ahead of time. The motion court further found that Sousley's stepdaughter's testimony would not have provided any indication of whether the uncharged conduct occurred as Victim never testified that Sousley's stepdaughter was present when any of the uncharged abuse occurred. The motion court found that the other evidence on which Sousley relied would have been tangentially relevant at best, and noted that trial counsel did call witnesses to impeach Victim's credibility at trial, but that the jury chose not to believe them. The motion court concluded that it would not second-guess trial counsel's strategy, and denied relief on Sousley's claim.

The motion court's conclusion that counsel's performance was not constitutionally deficient is not clearly erroneous. As an initial matter, Sousley's argument is that trial counsel should have presented a large amount of evidence regarding Victim's testimony of the circumstances surrounding conduct for which Sousley was not on trial. While such evidence might have had some value for impeachment purposes, the use of such evidence would have required placing the jury's focus on whether uncharged conduct occurred rather than whether the charged conduct occurred. The record indicates that counsel had considered how best to handle such situations and had made the determination to minimize the risk of confusing the issues at trial by limiting the amount of time directing the jury's

18

focus on the events surrounding the uncharged conduct. Counsel prudently sought to impeach Victim's testimony regarding the circumstances surrounding the uncharged conduct without spending too much time focusing the jury's attention on whether the uncharged conduct rather than the charged conduct had occurred. Counsel elicited testimony from defense witnesses that Sousley did not own a white van, that Victim never stayed at Sousley's house in Owensville, and elicited testimony that Owensville was the same distance to Columbia as Climax Springs such that it would not have been on the way to a moving job in Columbia. As the motion court stated, the jury chose not to believe the testimony of the defense witnesses. However, evaluating counsel's performance under *Strickland* "requires that every effort be made to eliminate the distorting effects of hindsight[.]" *Strickland*, 466 U.S. at 689. In doing so, a court should be mindful that "[t]here are countless ways to provide effective assistance in any given case." *Id.* In this matter, Sousley has failed to overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *See id.*

In this matter, much of the evidence that Sousley argues his counsel should have presented was cumulative to evidence that was presented at trial. *See Williams v. State*, 168 S.W.3d 433, 441 (Mo. banc 2005) ("Counsel will not be

found ineffective for deciding not to introduce cumulative evidence."). Further, little of the evidence presented at the motion hearing would have established what Sousley argues it would have established. *See State v. Twenter*, 818 S.W.2d 628, 643 (Mo. banc 1991) ("Ordinarily, a defendant is not entitled to relief merely because defense counsel elects not to present evidence of dubious impeachment value.").

Regarding the vehicle records, the property tax records do not establish the color or appearance of the vehicles owned by Sousley, do not establish what vehicles were owned in the summer of 2016 (as opposed to January 1, 2016), and could not rule out the possibility that a vehicle not owned was utilized during the moving job.[8]

Regarding the evidence of the moving job for Blanco, none of the evidence establishes that the Blanco job was the job with which Victim assisted. Although Blanco testified that one "lady" was present that was perhaps a sister-in-law, Blanco did not testify as to the likely age of the female that was with Sousley and

---

[8] The property tax records do list a description of "PKUP" for a 2004 Ford Excursion and a 2008 Ford Escape. At trial, Sousley's wife testified that Sousley owned two box trucks for moving and a silver Ford Excursion. Grandfather testified that Sousley owned a box truck which was a moving truck and a four-door Excursion which was "kind of a dark gray/black combo." Neither Sousley's wife nor Grandfather testified regarding ownership of a 2008 Ford Escape which was listed on the property tax records. Nothing in the record indicates the color or appearance of such vehicle.

did not testify (nor was she asked) whether a fourteen-year-old girl assisted with the move. Further, there were numerous discrepancies between the moving records and the testimony of Blanco regarding the start time, hours worked, date, and amount of pay for the moving job. Sousley had elected not to testify at trial, but his deposition testimony at the evidentiary hearing was inconsistent with that of Blanco regarding why the move did not occur on the scheduled date. Sousley testified that Blanco had rescheduled and did not mention anything regarding having failed to show up when scheduled resulting in a change in the scope of the moving job to being one that involved loading a truck instead of loading a truck and driving it to Florida to unload.

Regarding Grandfather's testimony at the evidentiary hearing, Grandfather testified that he was called at trial to testify about the move, but testified that he "couldn't remember at the time," had been sick, and "couldn't even hardly think, much less testify[.]" Regarding the record of the swimming pool, there is no indication in the record that Victim had ever stated any details of swimming prior to trial, and when Victim testified as to having gone swimming on the morning of the moving job, Victim did not state that the swimming occurred at a waterpark.[9]

---

[9] Regarding Detective Loehner's testimony, Loehner did testify that Sousley had told him that Sousley, Victim and Grandfather had traveled from Grandfather's house to the site of the moving job, and then had returned home the next day, whereas it appears from the audio recording that Sousley had told Loehner that they had returned the same day. Either scenario of what Sousley

21

Although some of the evidence that Sousley argues should have been presented at trial might have been of marginal value, it would have been largely cumulative of the evidence which defense counsel did put forward at trial and would not have provided Sousley with a new or different defense than the viable defense that trial counsel asserted. Moreover, none of the evidence would have directly challenged Victim's testimony regarding the incident of uncharged conduct: that Sousley had abused Victim while they were alone in a box van. Additionally, presenting such evidence would have carried the risks of focusing the jury's attention on uncharged conduct and confusing the issues. The record indicates that trial counsel considered and sought to avoid such risks. The motion court concluded that trial counsel's performance was not unconstitutionally deficient. This conclusion was not clearly erroneous.

Point two is denied.

---

said would have been different from Victim's account of events, as Victim testified that she stayed the night with Sousley the night before the moving job. As such, Sousley's arguments regarding the audio recordings are far afield of what was alleged in his amended motion regarding presenting evidence to impeach Victim's testimony. Moreover, as the motion *in limine* filed by Sousley's prior trial counsel indicated, there were a lot of references on the audio recording that could have been damaging to Sousley's case, such that attempting to introduce portions of the audio recording might have carried risks as well.

**Points Three & Four**

In his third and fourth points, Sousley argues that the motion court clearly erred when it denied his claim of ineffective assistance of counsel based on his counsel's failure to object to the verdict directors for Counts I and III on the basis that the verdict directors did not ensure jury unanimity. Specifically, Sousley argues that the State produced evidence at trial of multiple distinct incidents of Sousley placing his penis in the mouth of Victim (Count I), and Sousley touching Victim's genitals with his hand (Count III), but that the verdict directors for Counts I and III did not identify the specific incidents in evidence to which they referred, such that these verdict directors did not ensure that the jurors were in agreement as to a single incident in which Sousley placed his penis in the mouth of Victim or a single incident in which Sousley touched Victim's genitals. Sousley argues that his counsel's failure to object and request more specific instructions constituted ineffective assistance of counsel, and that there is a reasonable probability that the outcome of trial would have been different if the jury had been given more specific verdict directors for Counts I and III.

Article I, section 22(a) of the Missouri Constitution guarantees the right to a unanimous jury verdict. *State v. Celis-Garcia*, 344 S.W.3d 150, 155 (Mo. banc 2011). "For a jury verdict to be unanimous, the jurors must be in substantial

agreement as to the defendant's acts, as a preliminary step to determining guilt."

*Id.* (internal quotations, citations, and brackets omitted). The issue of jury

unanimity is sometimes implicated in what are commonly known as "multiple

acts" cases. *Id.* at 155-56. "A multiple acts case arises when there is evidence of

multiple, distinct criminal acts, each of which could serve as the basis for a

criminal charge, but the defendant is charged with those acts in a single count." *Id.*

In determining whether a case involves multiple acts, factors considered are "(1)

whether the acts occur at or near the same time; (2) whether the acts occur at the

same location; (3) whether there is a causal relationship between the acts, in

particular whether there was an intervening event; and (4) whether there is a fresh

impulse motivating some of the conduct." *Id.* at 156 (citation omitted). In cases

where the evidence indicates that a defendant committed multiple distinct acts, the

state can ensure that the jury unanimously agrees as to which specific criminal acts

were committed by "(1) electing the particular criminal act on which it will rely to

support the charge or (2) the verdict director specifically describing the separate

criminal acts presented to the jury and the jury being instructed that it must agree

unanimously that at least one of those acts occurred." *Id.* at 157.

In addressing juror unanimity, the *Celis-Garcia* Court made clear that it was

not addressing "sexual abuse cases involving repeated, identical sexual acts

committed at the same location and during a short time span [wherein] the victim would be unable to distinguish sufficiently among the acts." *Id.* at 157 n.8. Since *Celis-Garcia*, Missouri courts have determined that where there is evidence of multiple acts of abuse, but the acts are repeated and non-distinct such that the jurors would have no evidentiary basis on which to distinguish between the acts, there is no real risk that the jurors would base the convictions on different underlying criminal acts. *See State v. Dutcher*, 583 S.W.3d 440, 442 (Mo. App. S.D. 2019); *see also Hogan v. State*, 631 S.W.3d 564, 573 (Mo. App. W.D. 2021).

Sousley was charged with three counts of first-degree sodomy and one count of sexual abuse in the first degree for conduct occurring between June 19, 2016 and June 25, 2016. The jury found Sousley guilty on all four charges. As relevant to this appeal, in order to convict, the verdict director for Count I required the jury to find that Sousley "placed his penis in the mouth of" Victim. The verdict director for Count II required the jury to find that Sousley "placed his mouth on the genitals of" Victim. Count III required the jury to find that Sousley "touched the genitals of [Victim] with his hand[.]" Count IV required the jury to find that Sousley "touched the breast of" Victim.[10]

---

[10] Sousley's arguments on these points do not relate to the jury's findings on Counts II and IV.

Victim testified at trial to a time period during which Sousley came to stay at her house in St. Joseph for a week while Sousley was helping to pack up Victim's mother's belongings for a planned move. At one point during the week, Sousley commented to Victim that she was "making him hard[.]" Victim and Sousley then went upstairs to Victim's room where Sousley asked Victim to perform oral sex on him, which Victim did. Victim testified that she performed oral sex on Sousley more than one time, sometimes more than once a day, but that she could not remember the details of every single time that it occurred. Victim testified that things other than Sousley putting his penis in her mouth also occurred. Victim testified that on one occasion Sousley was on her bed and she was on top of him and Sousley put his mouth on her vagina and Victim's mouth was on Sousley's penis. Victim testified that at one point in time Sousley ejaculated into her mouth in her room, but Victim could not recall when this occurred. Victim testified that there was another occasion when Victim and Sousley were on the couch in the living room and Sousley saw Victim's underwear through her shorts, and Sousley stuck his fingers in Victim's vagina. Victim testified to a different incident which occurred in her room where Sousley "was sucking on [her] boobs" causing bruising, and Sousley stuck his fingers in her vagina "really hard," which hurt and caused bleeding.

26

Sousley's amended motion argued that there were two distinct incidents to which Victim testified wherein Sousley placed his penis in her mouth. Sousley argued that the first distinct incident occurred when Sousley told Victim that Victim was "making him hard" after which the two went upstairs to Victim's room where, at his request, Victim performed oral sex on Sousley. Sousley argued that the second distinct incident to which Victim testified occurred when Victim and Sousley were in Victim's room and they simultaneously performed oral sex on each other.

Sousley also argues that there were two distinct incidents to which Victim testified wherein Sousley touched Victim's genitals with his hand. Sousley argues the first instance occurred when Sousley and Victim were sitting on the couch in the living room when Sousley could see Victim's underwear through her shorts and Sousley stuck his fingers in her vagina. Sousley argues the second distinct incident occurred in Victim's bedroom when Sousley stuck his fingers in vagina "really hard" and made her bleed.

Sousley contends that the verdict directors for Counts I and III were not specific enough to guarantee that the jury unanimously agreed as to which incident of Sousley placing his penis in the mouth of Victim or which incident of Sousley touching Victim's genitals occurred.

27

The motion court addressed Sousley's claims regarding the verdict directors for Counts I and III together and found that Sousley was convicted of three counts of statutory sodomy which were identified as three separate incidents in the charging document. The motion court found that the acts underlying Counts I and III were testified as to separate times and separate locations within Victim's house such that Sousley's case was distinguished from *Celis-Garcia*. The motion court then denied Sousley's claims.

Although there may be some confusion regarding the motion court's findings as to why *Celis-Garcia* was inapplicable (particularly the suggestion that this was not a multiple acts case), it is unnecessary to address that further, as we find that Sousley failed to establish prejudice under *Strickland*. That is, based on the record before us, we find no reasonable likelihood that the outcome of trial would have been different if the jury had been given more specific instructions.

*Strickland* instructs courts reviewing an ineffectiveness claim to consider the totality of the evidence before the jury. *Strickland*, 466 U.S. at 695. In doing so, courts should be mindful that "[s]ome of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways." *Id.*

> Taking the unaffected findings as a given, and taking due account of
> the effect of the errors on the remaining findings, a court making the

prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id.* at 696.

In this matter, the jury unanimously found that Sousley had placed his mouth on Victim's genitals (Count II), and that Sousley had touched Victim's breasts (Count IV). Neither of these findings would have been affected if the jury had been instructed differently on Counts I and III. Thus, the jury, in findings that would have been entirely unaffected had the jury been instructed differently on Counts I and III found that Sousley committed first-degree sodomy (by placing his mouth on Victim's genitals) and first-degree sexual abuse (by touching Victim's breasts) between June 19, 2016 and June 25, 2016.

Regarding the verdict director for Count I, Sousley argues that the verdict director would have been sufficiently specific if it specifically described each separate incident to which Victim testified regarding Sousley placing his penis in Victim's mouth and instructed the jury that it must unanimously agree that at least one of those acts occurred. *See Celis-Garcia*, 344 S.W.3d at 157. Regarding the verdict director for Count III, Sousley argues that the verdict director would have been sufficiently specific if it described each of the two incidents to which Victim

testified regarding Sousley touching her genitals and instructed the jury that it must unanimously agree that at least one of those two acts occurred. *See id.*

Regarding Count I, the jury (as instructed at trial) unanimously found that Sousley had placed his penis in Victim's mouth. However, in the absence of a more specific instruction, it is conceivable that some members of the jury might have found that Sousley did so during the incident that occurred after Sousley told Victim that she was "making him hard" and at no other time, while other members of the jury might have found that Sousley did so while his mouth was on Victim's genitals, and that he did so at no other time.

Regarding Count III, the jury (as instructed at trial) unanimously found that Sousley had touched Victim's genitals with his hand. However, in the absence of a more specific instruction it is conceivable that some members of the jury might have found that Sousley did so on the couch in the living room and at no other time, while other jurors might have found that Sousley did so during the incident in Victim's bedroom when Sousley stuck his fingers in Victim's vagina "really hard" and that Sousley did not do so at any other time.

Despite the fact that it is *conceivable* that the jury might have found differently had the jury received different instructions, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of

the proceeding." *Strickland*, 466 U.S. at 693. Rather, the question is whether "the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id.* at 696. Based on the totality of the evidence before the jury in this case, we do not find it reasonably likely that a jury that found that Sousley placed his mouth on Victim's genitals and touched Victim's breasts (findings unaffected by the asserted error of counsel) was reasonably likely to fail to come to unanimous agreement regarding the other incidents of Sousley placing his penis in Victim's mouth or touching Victim's genitals.

In asserting prejudice, Sousley relies on *Hoeber* for the proposition that the verdict directors in Sousley's case "created a real risk that the jurors did not unanimously agree on the specific acts of statutory sodomy" for which they found Sousley guilty. *See Hoeber v. State*, 488 S.W.3d 648, 655 (Mo. banc 2016). Although *Hoeber* was a case in which the Missouri Supreme Court found that a defendant had established prejudice under *Strickland* due to his counsel's failure to object to verdict directors on jury unanimity grounds, *see Hoeber*, 488 S.W.3d at 658, the facts of *Hoeber* were quite distinct from the facts of Sousley's trial. Specifically, in *Hoeber* there was conflicting evidence of multiple acts of hand-to-genital contact. *Id.* at 654. The child in *Hoeber* had testified that hand-to-genital

31

contact had occurred in the kitchen, and that no touching occurred in the bedroom, bathroom, or living room. *Id.* at 652. The child's mother testified that the child had told her that the touching occurred in the kitchen and the bedroom. *Id.* The child's therapist testified that the child had previously told her that the defendant had touched her, then stated that the defendant did not touch her, then stated that the defendant had touched her in the bedroom, kitchen, bathroom, and living room. *Id.* A statement given by the defendant was also read into evidence that stated that the defendant had touched the child inappropriately twice in the bathroom, but denied all other touching. *Id.* The defendant later argued that the statement was coerced. *Id.* In sum, *Hoeber* was a case in which there was conflicting testimony about which of the specific acts occurred – a circumstance which the Supreme Court emphasized multiple times in *Hoeber*. *See id.* at 657 ("At trial, the jury heard conflicting statements about multiple incidents of hand-to-genital contact."); *id.* at 659-60 (noting that the insufficiently specific verdict directors did not require the jurors to agree as to which of the child's "conflicting disclosures of abuse constituted each offense"); *see also State v. Escobar*, 523 S.W.3d 545, 553 (Mo. App. W.D. 2017) (finding no reasonable argument that manifest injustice occurred where there were no substantial conflicts in the evidence regarding the incidents of abuse).

In this matter, the conflicts in the evidence present in *Hoeber* were simply not present. Sousley has failed to establish that the jury was reasonably likely to have returned a different verdict had it been instructed differently on Counts I and III.

Points three and four are denied.

## Points Five & Six

In his fifth and sixth points on appeal, Sousley argues that the motion court erred in denying postconviction relief because Sousley's appellate counsel was unconstitutionally deficient by not attempting to raise plain error claims on direct appeal regarding the verdict directors for Counts I and III. Sousley contends that his appellate counsel should have sought plain error review on direct appeal regarding the same jury unanimity issue that was the subject of Sousley's third and fourth points.

The motion court denied relief on Sousley's claims relating to his appellate counsel's conduct with respect to the verdict directors for Counts I and III for the same reason that the motion court denied relief relating to trial counsel's conduct. As with Sousley's third and fourth points, it is unnecessary to address the motion court's conclusion that *Celis-Garcia* was inapplicable, because we find that Sousley has failed to establish that it was reasonably likely that his convictions

would have been reversed on direct appeal if his appellate counsel had asserted plain error claims regarding the verdict directors for Counts I and III.

First, whether an appellate court reviews a plain error claim at all is discretionary. Rule 30.20. Accordingly, the court on appeal would have had to choose to exercise its discretion to review such claims at all. Additionally, such a claim would require a reviewing court to determine that the error was evident, obvious and clear, and that the error resulted in manifest injustice or miscarriage of justice. *State v. Brandolese*, 601 S.W.3d 519, 531 (Mo. banc 2020); Rule 30.20. Such a determination that manifest injustice or miscarriage of justice has resulted from the asserted error requires an appellant to establish a greater showing of prejudice to justify reversal than does the *Strickland* standard. *Deck v. State*, 68 S.W.3d 418, 427 n.5 (Mo. banc 2002) ("The standard for finding prejudice in the context of preserved error is lower than the standard for finding error under *Strickland*, and both are lower than the plain error standard."). For an appellant to establish reversible error on plain error review from an instructional error, the appellant "must show more than mere prejudice and must show that the trial court has so misdirected or failed to instruct the jury that it is apparent to the appellate court that the instructional error affected the jury's verdict, and caused manifest injustice or miscarriage of justice. *State v. Gannan*, 658 S.W.3d 103, 111-112 (Mo.

34

App. W.D. 2022) (internal quotations and brackets omitted).  Based on the record before us, we find no reasonable likelihood that Sousley's convictions on Counts I and III would have been reversed had his appellate counsel asserted plain error claims regarding the verdict directors for Counts I and III.[11]

Points five and six are denied.

## Conclusion

The judgment is affirmed.

_____
Thomas N. Chapman, Judge

All concur.

---

[11] Although we recognize that the Missouri Supreme Court found manifest injustice in *Celis-Garcia* based on the trial court's error in failing to provide the jury with sufficiently specific instructions to ensure juror unanimity, *Celis-Garcia* was a case in which the defense relied on "evidentiary inconsistencies and factual improbabilities respecting each specific allegation of hand-to-genital contact[,]" which the *Celis-Garcia* Court found "ma[de] it more likely that individual jurors convicted [the defendant] on the basis of different acts."  *See Celis-Garcia*, 344 S.W.3d at 159.  The circumstances present in *Celis-Garcia* are simply not present in this case.