

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

RE'QUON D. DILLARD,             )
                           )
        Appellant,          )
                           )
v.                         )      WD86252
                           )
STATE OF MISSOURI,       )      Opinion filed:  August 13, 2024
                           )
        Respondent.      )

### APPEAL FROM THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI
### THE HONORABLE THOMAS FINCHAM, JUDGE

Division One:  Edward R. Ardini, Jr., Presiding Judge,
Mark D. Pfeiffer, Judge and Cynthia L. Martin, Judge

Re'quon Dillard appeals the judgment of the Circuit Court of Platte County denying his Rule 29.15 motion for postconviction relief. Dillard was convicted, after a jury trial, of first-degree robbery, first-degree assault, and armed criminal action under a theory of accomplice liability. Dillard's defense at trial was one of misidentification: that he did not commit these crimes and the four eyewitnesses who identified him—two of which were co-participants in the offenses—were mistaken and/or falsely identified him in order to gain a benefit in their own criminal cases. In his postconviction motion, Dillard asserted his trial counsel was ineffective for failing to consult and call an expert at trial that would have testified about the reliability of eyewitness identifications. The motion court denied

Dillard's claim after an evidentiary hearing, finding trial counsel's "decision to not hire an expert was reasonable" and "counsel's alleged error in failing to call an eyewitness expert" did not result in prejudice. On appeal, Dillard asserts these findings were clearly erroneous. We affirm the judgment of the motion court.

**Factual and Procedural Background[1]**

*The crimes*

The State charged Dillard under a theory of accomplice liability with one count of first-degree assault, one count of first-degree robbery, and one count of armed criminal action. The State alleged that on February 17, 2017, Dillard assisted two men—Co-Participant W and Co-Participant J—in executing an armed robbery at K.H.'s home. Also involved in these crimes was Co-Participant K.

The night before the crimes, Co-Participant W was at his home with Co-Participant K and her boyfriend ("Boyfriend"); they were drinking alcohol, smoking marijuana, and doing cocaine. Co-Participant W said he wanted to "hit a lick on" K.H.; in other words, "go and rob him." Co-Participant W and K.H. had been friends until K.H. provided information to the police that led to the arrest of Co-Participant W's brother. Boyfriend

---

[1] "On appeal from the motion court's ruling on a 29.15 motion, we view the facts in the light most favorable to the verdict." *Goodwater v. State*, 560 S.W.3d 44, 49 n.1 (Mo. App. W.D. 2018). The facts of the underlying case are in part summarized from our *per curiam* order and memorandum affirming Dillard's convictions on direct appeal in *State v. Dillard*, WD83732, without further attribution.

was also a friend of K.H. and agreed to show Co-Participant W where K.H. lived.[2] Co-Participant K agreed to lend Co-Participant W her car in exchange for cocaine.

The following night, Co-Participant K drove Co-Participant W and Boyfriend to purchase more cocaine. After, Co-Participant W directed Co-Participant K to a gas station to pick up two people that were going to "help him do the lick." At the gas station, Dillard and Co-Participant J joined them. Co-Participant K had never seen these two men before. Co-Participant W knew Co-Participant J, and had seen Dillard "once or twice before" and on Facebook.

Co-Participant W took over driving responsibilities, and drove everyone to Parkville, Missouri while they did cocaine. Boyfriend directed them to K.H.'s house, and then he and Co-Participant K were dropped off down the street. The other men drove toward K.H.'s residence.

The men spotted K.H. walking down his street. One of them got out of the car, grabbed K.H., and pushed him into the front passenger seat. K.H. recognized Co-Participant W, who was driving. The other two men were in the back seat; they put guns to K.H.'s head and demanded he bring them into his home. All four men got out of the car. Dillard and Co-Participant J were on either side of K.H., pointing their guns at him and threatening to kill him.

The home where K.H. lived belonged to his grandfather ("Grandfather"). He was at the home that night, along with K.H.'s mother ("Mother"), K.H.'s uncle ("Uncle"), and

---

[2] Boyfriend was a minor, and was not criminally charged in connection with these crimes.

other individuals. As K.H. and the men entered the home, K.H. called out, "Mom!" Mother walked down the hallway and saw K.H. with three men surrounding him. The three men demanded money from Mother. She tried unsuccessfully to lure them outside. Co-Participant J pointed a gun at her stomach and demanded she give him money. Mother saw Dillard point a gun at Uncle, who was lying on the couch. Uncle tried to get up from the couch, but Dillard yelled at him to get back down. Dillard then went into the kitchen and rifled through the drawers.

Grandfather was in his bedroom when he heard K.H. say, "Please don't hurt my Mom." Grandfather looked outside his room and saw someone walking Mother across the hallway with a gun held to her. Grandfather grabbed a souvenir machete that was hanging on the wall and started out of his bedroom. Co-Participant J responded by shooting Grandfather, who fell to the ground. Mother ran to Grandfather and called 911. Dillard and Co-Participant W fled,[3] and Co-Participant J followed after he grabbed Mother's purse. All three got back in the car, picked up Co-Participant K and Boyfriend, and went back to the gas station, where Dillard and Co-Participant J were dropped off. Meanwhile, Grandfather was transported by ambulance to the hospital, where he was treated for gunshot wounds to his arm and chest. Although his injuries were serious, Grandfather survived.

*Eyewitness identifications of Dillard prior to trial*

After Grandfather was taken to the hospital, K.H. went to Co-Participant W's Facebook profile and looked through his friends list in an attempt to identify the other two

---

[3] After Co-Participant W had fled, his wallet—which contained his driver's license and Social Security card—was found near the front door of K.H.'s house.

men. He found Co-Participant J's profile there. K.H. then went to Co-Participant J's friends list and located Dillard's profile. K.H. showed the Facebook profiles to Mother, and then provided them to law enforcement.

Later, Mother was interviewed by a detective, who showed Mother photo lineups. The detective asked Mother to identify if any of the men were in her home on February 17th. Mother identified Dillard and Co-Participant J.

Co-Participant K was arrested and interviewed after signing a *Miranda* waiver. A detective showed Co-Participant K three photo lineups and asked if she recognized anyone. The first lineup contained Co-Participant W's photo. Co-Participant K did not identify any suspects in that lineup. In the second lineup, Co-Participant K recognized an individual; that individual, however, was not a suspect. The third lineup contained Dillard's photo. Co-Participant K pointed to Dillard's photo and said "he looked familiar and she recognized him and thought he was the guy that was in the back seat of the car with her." The detective then showed Co-Participant K printed copies of Dillard and Co-Participant J's Facebook profile pictures, and asked if they looked familiar. Co-Participant K said they "look exactly like the guys that were in the car with [her]."

*Trial proceedings*

Prior to trial, Dillard's counsel filed a motion to suppress Co-Participant K's identification of Dillard, asserting the detective used a suggestive identification process when he interviewed Co-Participant K, which resulted in a substantial likelihood of misidentification. After an evidentiary hearing on the matter, the trial court overruled

Dillard's motion to suppress, noting Co-Participant K's testimony relating to her identification of Dillard would be "fertile ground for cross-examination at trial."

K.H., Mother, Co-Participant K, and Co-Participant W testified at trial, and all four of them identified Dillard in the courtroom as committing the crimes charged. Co-Participant K and Co-Participant W testified that they had entered into agreements with the State to testify for the prosecution at Dillard's trial.[4] Co-Participant K testified that when she identified Dillard during her interview with the detectives, she had not yet reached an agreement with the State. Dillard's counsel cross-examined each of the four witnesses about the reliability of his or her identification.

After the close of evidence, the jury was given instructions, including an instruction on eyewitness identification patterned after MAI-CR 4th 410.02, which directed the jury to consider seventeen factors in determining whether an identification made by an eyewitness "is reliable or mistaken."

Dillard's closing argument focused on his defense of misidentification. Dillard's counsel highlighted the jury instruction on eyewitness identification, walking the jury through the factors and asserting they demonstrated that the identifications of Dillard were unreliable.

During deliberation, the jury submitted the following question to the trial court:

---

[4] Co-Participant K stated that she agreed to testify for the State with the expectation that her bond would be reduced, which it was. Co-Participant W testified that he "made a deal" that included "maybe amend[ing] [his] charges" and a "15-year plea if [he] cooperate[s] with the prosecution and help[s] testify" at the trial.

How did [Co-Participant W] identify the defendant? When did [Co-Participant W] identify the defendant? Was he provided a '6-pack'?[5] If so, when was 6-pack provided & when was plea deal provided?

The trial court responded: "You are to be guided by the evidence presented in court, and the court's instructions."

*Postconviction proceedings*

After his convictions were affirmed on appeal, Dillard filed a timely *pro se* motion for postconviction relief pursuant to Rule 29.15, and appointed postconviction counsel filed a timely amended motion on Dillard's behalf. In his amended motion, Dillard asserted his trial counsel provided ineffective assistance of counsel "when he failed to hire and call an eyewitness identification expert who could provide a scientific explanation and support for problems with eyewitness identifications of Mr. Dillard, and in particular the problems with [Mother] and [K.H.'s] identification of Mr. Dillard." He further asserted that "had counsel investigated, consulted, and hired an expert witness, the expert would have testified at Mr. Dillard's trial and provided Mr. Dillard with a viable defense of mistaken identification." To prove this claim, Dillard asserted he would rely on the testimony of Dr. K.P., a psychology professor at a university in California, "or a similarly-qualified eyewitness identification expert." Dillard alleged that Dr. K.P. "would testify that numerous factors challenge the reliability of the eyewitness identifications of Mr. Dillard by [Mother] and [K.H.]."

---

[5] A "six-pack" refers to a photo lineup that contains pictures of six individuals. There was testimony that Co-Participant K was shown "six-packs" to identify the other co-participants. There was no testimony or evidence that Co-Participant W identified anyone via a photo lineup.

7

Dillard attached to his amended motion a Declaration of Dr. K.P., in which she described "the factors that affect the accuracy of eyewitness memory and identification in general" and explained "how these factors are likely to have applied in [Dillard's] case." One of the factors Dr. K.P. discussed was cross-race identification, and specifically that "[a] significant number of scientifically valid research studies have reported that individuals are more accurate identifying faces of their own race than faces of another race[.]"[6] In this case, Dillard, Co-Participant W, and Co-Participant J are Black. Co-Participant K, Mother, and K.H. are White.

The motion court held an evidentiary hearing on Dillard's amended motion. Trial counsel testified at the hearing, and although Dr. K.P. did not testify in person, the transcript of her deposition was admitted into evidence.

Trial counsel testified that he had considered hiring an eyewitness identification expert, however he ultimately decided against it after the State endorsed Co-Participant W as a witness:

Q. Did you consider hiring an eyewitness identification expert in this case?

A. I did think about it, yes, because that was something that had evolved over the last 10 years at this point. That was something that I had read about on one occasion but yeah, I did consider it.

Q. Did you consult with any expert?

A. I don't remember actually consulting with any experts specifically about this case. I know I thought about it and maybe I made a phone call to somebody

---

[6] Cross-race identification was one of the seventeen factors the jury was instructed to consider in the eyewitness identification instruction. That instruction provided: "In order to determine whether an identification made by a witness is reliable or mistaken, you should . . . also consider the following factors . . . *Nine*, whether the witness and the person in question are of different races or ethnicities[.]"

8

but I don't remember it and I certainly didn't, I mean, at the time, as I'm sure you understand, you have to fill out paperwork to get professionals involved as experts with the public defender system and I know for a fact I never asked for any money, went down that road, but I . . . certainly did consider it.

Q. Do you remember why you didn't go any further with that consideration?

A. I did because, and, again, I just know from what I've read is that the biggest problems with identification end up being cross-race identification so if a black person is the, if a white person is blaming the black folks, a black person, then their identifications can be very problematic and I did consider that but when the State made its deal with [Co-Participant W] I felt like that it just wasn't something I was going to go down, a road I was going to go down because now they have an African-American person who is going to come in and point the finger at him, as well.

Trial counsel testified that he made a strategic decision not to hire an eyewitness identification expert: that he "gave up on the idea once [Co-Participant W] got involved because he was African-American and [trial counsel] didn't think the testimony would be as impactful."

Trial counsel further testified that he was aware of other factors affecting the reliability of eyewitness identifications, such as the "ability to see the person, the time that goes into seeing," and "all those factors that are listed in [the eyewitness identification jury] instruction." His strategy regarding these factors was just to "argue them."

The motion court denied Dillard's claim of ineffective assistance of counsel, finding "trial counsel's decision to not hire an expert was reasonable" and Dillard did not suffer prejudice from trial counsel's decision. The motion court determined that "[t]he standard is not (nor can it be) that an expert has to be called in every case," and "[j]ust because an expert could provide additional information does not rise to the level of prejudice required

to establish a reasonable probability that the outcome of the trial would have been different."

Dillard appeals.

**Standard of Review**

"This Court reviews the denial of post-conviction relief to determine whether the motion court's findings of fact and conclusions of law are clearly erroneous." *Davis v. State*, 486 S.W.3d 898, 905 (Mo. banc 2016) (citing Rule 29.15(k)). "A judgment is clearly erroneous when, in light of the entire record, the court is left with the definite and firm impression that a mistake has been made." *Id.* "The motion court's findings are presumed correct." *Id.* "This Court defers to the motion court's superior opportunity to judge the credibility of witnesses." *Id.* (internal marks omitted).

"To be entitled to post-conviction relief for ineffective assistance of counsel, a movant must show by a preponderance of the evidence that his or her trial counsel failed to meet the *Strickland* test . . . ." *Id.* (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). "Under *Strickland*, Movant must demonstrate that: (1) his trial counsel failed to exercise the level of skill and diligence that a reasonably competent trial counsel would in a similar situation, and (2) he was prejudiced by that failure." *Id.* at 906.

To demonstrate the first prong—or the "performance" prong—of the *Strickland* test, the movant "must overcome the strong presumption that trial counsel's conduct was reasonable and effective." *Id.* "To overcome this presumption, a movant must identify specific acts or omissions of counsel that, in light of all the circumstances, fell outside the wide range of professional competent assistance." *Id.* (internal marks omitted). "Trial

10

strategy decisions may be a basis for finding ineffective assistance of counsel only if that decision was unreasonable." *Id.* "Strategic choices made after a thorough investigation of the law and the facts relevant to plausible opinions are virtually unchallengeable." *Id.* (internal marks omitted).

To establish prejudice, the movant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Deck v. State*, 68 S.W.3d 418, 429 (Mo. banc 2002). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

**Analysis**

In his sole point on appeal, Dillard asserts "trial counsel's failure to consult and call an eyewitness identification expert to testify was unreasonable, constituted deficient performance, and was prejudicial, in that the circumstances established a duty to consult and call an expert witness to testify, cross-racial identification was not the only factor that decreased the reliability of eyewitness identifications, and there was an absence of other evidence corroborating the witnesses' identifications." We disagree, and conclude the motion court did not clearly err in finding trial counsel's decision not to hire an expert was reasonable.

"To prevail on a claim of ineffective assistance of counsel for failure to call a witness, the following must be shown: 1) Trial counsel knew or should have known of the existence of the witness; 2) the witness could be located through reasonable investigation;

11

(3) the witness would testify,[7] and 4) the witness's testimony would have produced a viable defense." *Worthington v. State*, 166 S.W.3d 566, 577 (Mo. banc 2005) (internal marks omitted); *see also Hosier v. State*, 593 S.W.3d 75, 88 (Mo. banc 2019) (listing the same requirements for an expert witness). "Even then, counsel's decision not to call a witness is presumptively a matter of trial strategy and will not support a claim of ineffective assistance of counsel unless the defendant clearly establishes otherwise." *Worthington*, 166 S.W.3d at 577 (internal marks omitted); *see also McLaughlin v. State*, 378 S.W.3d 328, 343 (Mo. banc 2012) ("Trial counsel's selection of which expert witnesses to call at trial is generally a question of trial strategy and is virtually unchallengeable."). "No matter how ill-fated it may appear in hindsight, a reasonable choice of trial strategy cannot serve as a basis for a claim of ineffective assistance." *Johnson v. State*, 406 S.W.3d 892, 900 (Mo. banc 2013).

Here, trial counsel's failure to hire an eyewitness identification expert was not the result of oversight or lack of careful consideration; rather, trial counsel made the strategic decision not to call an expert. Trial counsel testified that he was aware of issues with cross-race identification, and other factors affecting the reliability of eyewitness identification, including those listed in the jury instruction. He stated that he had considered hiring an

---

[7] The State argues Dillard failed to satisfy this third condition, contending Dr. K.P. would not have been able to testify at trial because she was a college professor in California and she would have been teaching on the dates of Dillard's trial. Dillard responds that the trial date could have been moved to accommodate Dr. K.P.'s schedule or Dr. K.P. could have testified remotely. Further, Dr. K.P. stated that if she were unable to testify, she had "a referral list of people" and would have referred trial counsel to someone who "knew the literature" and would have provided the same general testimony as she would have. We need not resolve the issue of Dr. K.P.'s availability, however, because—as discussed in further detail below—we are affirming on the ground that trial counsel's decision not to hire an eyewitness identification expert was reasonable trial strategy.

eyewitness identification expert, but abandoned the idea when the State made a deal with Co-Participant W to testify at trial.

Trial counsel's strategic decision was objectively reasonable. Prior to Co-Participant W agreeing to testify for the prosecution, the witnesses who would identify Dillard at trial did not know him and had not seen him until the night of the crimes. Thus, their identifications of Dillard were subject to attack as mistaken or inaccurate. Eyewitness identification experts explain how and why people make inaccurate identifications. *See State v. Carpenter*, 605 S.W.3d 355, 362-63 (Mo. banc 2020) (an eyewitness identification expert may testify about factors that affect the accuracy of an identification, but not about the credibility of the identification, as witness credibility is solely within the province of the jury). However, once Co-Participant W agreed to testify, and trial counsel knew Co-Participant W would "point the finger" at Dillard, it was reasonable for trial counsel to believe that expert testimony might not be "as impactful." Indeed, Co-Participant W was an accomplice who testified that he knew Dillard prior to committing these crimes with him.[8]

Thus, trial counsel pivoted to a strategy of attacking the witnesses' identifications without the use of an expert. He filed a pre-trial motion to suppress Co-Participant K's identification of Dillard. He cross-examined each identifying witness about their identifications, and sought to show Co-Participant W and Co-Participant K falsely

---

[8] We do not mean to insinuate that, after learning Co-Participant W would testify, it would have been **un**reasonable for trial counsel to nonetheless hire an eyewitness identification expert. "There are countless ways to provide effective assistance in any given case." *Strickland*, 466 U.S. at 689.

13

identified Dillard for personal gain, and thus their identifications were not credible. He requested the jury be instructed on the reliability of eyewitness identifications, and the jury was so instructed. He argued extensively in closing that each of the four identifying witnesses had incorrectly identified Dillard as being involved in these crimes. He used the factors in the jury instruction to support his argument that Dillard was misidentified. This deliberate strategy to challenge the identifications without the use of an expert fell within the wide range of professional competent representation. *See Bozeman v. State*, 653 S.W.3d 132, 137 (Mo. App. E.D. 2022) ("we cannot say Counsel failed to act as a reasonably competent attorney when she made the strategic decision not to call an expert whose testimony, in her professional opinion, was unnecessary"); *McDaniel v. State*, 460 S.W.3d 18, 29-30 (Mo. App. E.D. 2014) (where trial counsel considered calling an expert to testify, but made the strategic decision not to do so, "[i]t was not ineffective assistance of counsel . . . to pursue one reasonable strategy to the exclusion of another reasonable trial strategy").

Dillard argues that trial counsel's use of cross-examination, jury instructions, and closing argument cannot justify his failure to consult and call an eyewitness identification expert as reasonable strategy, relying on *State v. Carpenter*, 605 S.W.3d 355 (Mo. banc 2020). But *Carpenter*—which was a direct appeal, not an appeal from a post-conviction motion—did not involve the issue presented here. *Carpenter* addressed whether a defendant was entitled to present testimony from an eyewitness identification expert at trial. The defendant in *Carpenter* sought to admit such evidence at trial, but the request was rejected by the trial court. 605 S.W.3d at 358. The Supreme Court held that the trial court's exclusion of this admissible evidence was an abuse of discretion, finding that the

14

availability of cross-examination, closing argument, and an eyewitness identification jury instruction were "not sufficient justifications to exclude otherwise admissible expert evidence." *Id.* at 364. The Supreme Court stated that "[a]lternatives to admissible evidence do not make such evidence inadmissible." *Id.*

Unlike in *Carpenter*, here, the question presented is, "When is defense counsel constitutionally ineffective for making the strategic decision not to present eyewitness identification expert testimony?" The distinction being that, just because a defendant may be entitled to present such expert testimony (as held in *Carpenter*), it does not follow that his counsel is required to present it. Indeed, this distinction arises in many criminal contexts: for example, just because a defendant may be entitled to raise a defense at trial, it does not follow that his counsel is necessarily ineffective by choosing not to raise that defense. *See, e.g.*, *Johnson*, 406 S.W.3d at 900 (affirming denial of the movant's claim of ineffective assistance of counsel where "[t]he record indicates trial counsel was aware of a potential diminished capacity defense," but "counsel made a deliberate choice not to pursue this strategy").

In essence, Dillard is arguing that when testimony from an eyewitness identification expert could be admitted at trial to support a defense of misidentification, the only reasonable course of action is for defense counsel to call such a witness, as cross-examination, argument, and jury instructions are not reasonable alternatives to expert testimony. But *Carpenter* does not so hold; rather, the Supreme Court in *Carpenter* contemplated a scenario in which defense counsel would reasonably choose not to call an eyewitness identification expert at trial, even while raising the defense of misidentification.

15

The Court stated that the jury instruction relating to the reliability of eyewitness identifications (MAI-CR 410.02) was approved so "that defendants could obtain the benefit of this science without the delay and expense of having to adduce expert testimony in each case" and the instruction "is to be given in cases in which an eyewitness identification is at issue even though no expert has testified regarding that science." 605 S.W.3d at 367-68. In short, we find *Carpenter* did not impose any duty on trial counsel in this case to call an eyewitness identification expert to testify at trial.

For the reasons stated above, we find the motion court did not clearly err in concluding trial counsel acted reasonably in deciding not to hire an eyewitness identification expert.[9] Point denied.

### Conclusion

The judgment of the motion court is affirmed.

_____
EDWARD R. ARDINI, JR., JUDGE

All concur.

---

[9] In light of this determination, we need not address Dillard's prejudice argument. *See Nigro v. State*, 467 S.W.3d 881, 885 (Mo. App. W.D. 2015) ("If either the performance prong or the prejudice prong is not met, then we need not consider the other, as the claim of ineffective assistance of counsel must fail if either prong is not present." (internal marks omitted)).

16